# UNITED STATES *v.* UNITED STATES SHOE CORP.

No. 97–372.   Argued March 4, 1998—Decided March 31, 1998

GINSBURG, J., delivered the opinion for a unanimous Court.

*Deputy Solicitor General Wallace* argued the cause for the United States. With him on the brief were *Solicitor General Waxman, Assistant Attorney General Hunger, Kent L. Jones, David M. Cohen, Todd M. Hughes,* and *Lara Levinson.*

*James R. Atwood* argued the cause for respondent. With him on the brief were *Brian S. Goldstein, Steven S. Weiser, Laurence M. Friedman, Paul A. Horowitz,* and *Robert A. Long, Jr.**

JUSTICE GINSBURG delivered the opinion of the Court.

The Export Clause of the Constitution states: "No Tax or Duty shall be laid on Articles exported from any State."

---

*\*Hardy Myers,* Attorney General of Oregon, *Michael D. Reynolds,* Solicitor General, *David Schuman,* Deputy Attorney General, and *Robert M. Atkinson,* Assistant Attorney General, filed a brief for the State of Oregon as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for Addison Wesley Longman et al. by *Carlos Rodriguez* and *Todd C. Fineberg;* for the Aluminum Co. of America et al. by *Melvin S. Schwechter, John C. Cleary,* and *Julie A. Coletti;* for Baxter Healthcare Corp. et al. by *Mark S. Zolno* and *Michael E. Roll;* for Boise Cascade et al. by *Steven P. Florsheim, Robert B. Silverman,* and *Erik D. Smithweiss;* for Cobe Laboratories, Inc., et al. by *Lynn S. Baker, Thomas E. Johnson,* and *Gregory W. Bowman;* for General Chemical Corp. et al. by *Patrick D. Gill, John S. Rode,* and *Eleanore Kelly-Kobayashi;* for the National Industrial Transportation League by *Nicholas J. DiMichael;* and for Texaco Refining and Marketing, Inc., et al. by *Steven H. Becker* and *Charles H. Critchlow.*

Briefs of *amici curiae* were filed for Amoco Chemical Co. by *Robert E. Burke* and *Christopher E. Pey;* for Arctic Cat, Inc., et al. by *Robert J. Hennessey;* for New Holland North America, Inc., et al. by *Munford Page Hall II* and *John B. Rehm;* and for Totes-Isotoner Corp. et al. by *John M. Peterson* and *George W. Thompson.*

U. S. Const., Art. I, § 9, cl. 5. We held in *United States* v. *International Business Machines Corp.*, 517 U. S. 843 (1996) *(IBM)*, that the Export Clause categorically bars Congress from imposing any tax on exports. The Clause, however, does not rule out a "user fee," provided that the fee lacks the attributes of a generally applicable tax or duty and is, instead, a charge designed as compensation for Government-supplied services, facilities, or benefits. See *Pace* v. *Burgess*, 92 U. S. 372, 375–376 (1876). This case presents the question whether the Harbor Maintenance Tax (HMT), 26 U. S. C. § 4461(a), as applied to goods loaded at United States ports for export, is an impermissible tax on exports or, instead, a legitimate user fee. We hold, in accord with the Federal Circuit, that the tax, which is imposed on an ad valorem basis, is not a fair approximation of services, facilities, or benefits furnished to the exporters, and therefore does not qualify as a permissible user fee.

I

The HMT, enacted as part of the Water Resources Development Act of 1986, 26 U. S. C. §§ 4461–4462, imposes a uniform charge on shipments of commercial cargo through the Nation's ports. The charge is currently set at 0.125 percent of the cargo's value. Exporters, importers, and domestic shippers are liable for the HMT, § 4461(c)(1), which is imposed at the time of loading for exports and unloading for other shipments, § 4461(c)(2). The HMT is collected by the Customs Service and deposited in the Harbor Maintenance Trust Fund (Fund). Congress may appropriate amounts from the Fund to pay for harbor maintenance and development projects, including costs associated with the St. Lawrence Seaway, or related expenses. § 9505.

Respondent United States Shoe Corporation (U. S. Shoe) paid the HMT for articles the company exported during the period April to June 1994 and then filed a protest with the Customs Service alleging the unconstitutionality of the toll

to the extent it applies to exports. The Customs Service responded with a form letter stating that the HMT is a statutorily mandated fee assessment on port users, not an unconstitutional tax on exports. On November 3, 1994, U. S. Shoe brought this action against the Government in the Court of International Trade (CIT). The company sought a refund on the ground that the HMT is unconstitutional as applied to exports.

Sitting as a three-judge court, the CIT held that its jurisdiction was properly invoked under 28 U. S. C. § 1581(i); on the merits, the CIT agreed with U. S. Shoe that the HMT qualifies as a tax. 907 F. Supp. 408 (1995). Rejecting the Government's characterization of the HMT as a user fee rather than a tax, the CIT reasoned: "The Tax is assessed *ad valorem* directly upon the value of the cargo itself, not upon any services rendered for the cargo . . . . Congress could not have imposed the Tax any closer to exportation, or more immediate to the articles exported." *Id.*, at 418. Relying on the Export Clause, the CIT entered summary judgment for U. S. Shoe.

The Court of Appeals for the Federal Circuit, sitting as a five-judge panel, affirmed. 114 F. 3d 1564 (1997). On auxiliary questions, the Federal Circuit upheld the CIT's exercise of jurisdiction under § 1581(i) and agreed with the lower court that the HMT applied to goods in export transit.[1] Concluding that the HMT is not based on a fair approximation of port use, the Federal Circuit also agreed that the HMT imposes a tax, not a user fee. In making this determination, the Court of Appeals emphasized that the HMT does not depend on the amount or manner of port use, but is determined solely by the value of cargo. Judge Mayer dissented; in his view, Congress properly designed the HMT as a user fee, a toll on shippers that supplies funds not for the

---

[1] The Government does not here challenge the determination that the HMT applies to goods in export transit.

general support of government, but exclusively for the facilitation of commercial navigation.

Numerous cases challenging the constitutionality of the HMT as applied to exports are currently pending in the CIT and the Court of Federal Claims.[2] We granted certiorari, 522 U. S. 944 (1997), to review the Federal Circuit's determination that the HMT violates the Export Clause.

## II

As an initial matter, we conclude that the CIT properly entertained jurisdiction in this case. The complaint alleged exclusive original jurisdiction in that tribunal under 28 U. S. C. § 1581(a) or, alternatively, § 1581(i). App. 26. We agree with the CIT and the Federal Circuit that § 1581(i) is the applicable jurisdictional prescription. The key directive is stated in 26 U. S. C. § 4462(f)(2), which instructs that for jurisdictional purposes, the HMT "shall be treated as if such tax were a customs duty."

Section 1581(a) surely concerns customs duties. It confers exclusive original jurisdiction on the CIT in "any civil action commenced to contest the [Customs Service's] denial of a protest." A protest, as indicated in 19 U. S. C. § 1514, is an essential prerequisite when one challenges an actual Customs decision. As to the HMT, however, the Federal Circuit correctly noted that protests are not pivotal, for Customs "performs no active role," it undertakes "no analysis [or adjudication]," "issues no directives," "imposes no liabilities"; instead, Customs "merely passively collects" HMT payments. 114 F. 3d, at 1569.

Section 1581(i) describes the CIT's residual jurisdiction over

---

[2] According to the Government, some 4,000 cases raising this claim are currently stayed in the CIT, with more than 100 additional cases stayed in the Court of Federal Claims. See Brief for United States 4.

"any civil action commenced against the United States . . . that arises out of any law of the United States providing for —

"(1) revenue from imports or tonnage;

> . . . . .

"(4) administration and enforcement with respect to the matters referred to in paragraphs (1)–(3) of this subsection . . . ."

This dispute, as the Federal Circuit stated, "involve[s] the 'administration and enforcement' of a law providing for revenue from imports because the HMT statute, although applied to exports here, does apply equally to imports." 114 F. 3d, at 1571. True, § 1581(i) does not use the word "exports." But that is hardly surprising in view of the Export Clause, which confines customs duties to imports. Revenue from imports and revenue from customs duties are thus synonymous in this setting. In short, as the CIT correctly concluded and the Federal Circuit correctly affirmed, "Congress [in § 4462(f)(2)] directed [that] the [HMT] be treated as a customs duty for purposes of jurisdiction. Such duties, by their very nature, provide for revenue from imports, and are encompassed within [§ ]1581(i)(1)." 907 F. Supp., at 421. Accordingly, CIT jurisdiction over controversies regarding the administration and enforcement of the HMT accords with § 1581(i)(4).[3]

### III

Two Terms ago, in *IBM*, this Court considered the question whether a tax on insurance premiums paid to protect

---

[3] Because we determine that the CIT has exclusive jurisdiction over challenges to the HMT under § 1581(i)(4), it follows that the Court of Federal Claims lacks jurisdiction over the challenges to the HMT currently pending there. See 28 U. S. C. § 1491(b). The plaintiffs in these challenges may invoke § 1631, which authorizes intercourt transfers, when "in the interest of justice," to cure want of jurisdiction. See also § 610 (as used in Title 28, the term "court" includes the Court of Federal Claims and the CIT).

exports against loss violated the Export Clause. Distinguishing case law developed under the Commerce Clause, 517 U. S., at 850–852, and the Import-Export Clause, *id.*, at 857–861, the Court held that the Export Clause allows no room for any federal tax, however generally applicable or nondiscriminatory, on goods in export transit. Before this Court's decision in *IBM*, the Government argued that the HMT, even if characterized as a "tax" rather than a "user fee," should survive constitutional review "because it applies without discrimination to exports, imports and domestic commerce alike." Reply Brief for United States 9, n. 2. Recognizing that *IBM* "rejected an indistinguishable contention," the Government now asserts only that HMT is " 'a permissible user fee,' " Reply Brief for United States 9, n. 2, a toll within the tolerance of Export Clause precedent. Adhering to the Court's reasoning in *IBM*, we reject the Government's current position.

The HMT bears the indicia of a tax. Congress expressly described it as "a *tax* on any port use," 26 U. S. C. § 4461(a) (emphasis added), and codified the HMT as part of the Internal Revenue Code. In like vein, Congress provided that, for administrative, enforcement, and jurisdictional purposes, the HMT should be treated "as if [it] were a customs duty." §§ 4462(f)(1), (2). However, "we must regard things rather than names," *Pace* v. *Burgess*, 92 U. S., at 376, in determining whether an imposition on exports ranks as a tax. The crucial question is whether the HMT is a tax on exports in operation as well as nomenclature or whether, despite the label Congress has put on it, the exaction is instead a bona fide user fee.

In arguing that the HMT constitutes a user fee, the Government relies on our decisions in *United States* v. *Sperry Corp.*, 493 U. S. 52 (1989), *Massachusetts* v. *United States*, 435 U. S. 444 (1978), and *Evansville-Vanderburgh Airport Authority Dist.* v. *Delta Airlines, Inc.*, 405 U. S. 707 (1972). In those cases, this Court upheld flat and ad valorem charges

as valid user fees. See *United States* v. *Sperry Corp.*, 493 U. S., at 62 (1½ percent ad valorem fee applied to awards certified by the Iran-United States Claims Tribunal qualifies as a user fee and is not so excessive as to violate the Takings Clause); *Massachusetts* v. *United States*, 435 U. S., at 463–467 (flat federal registration fee imposed annually on all civil aircraft meets genuine user fee standards and, as applied to state-owned aircraft, does not dishonor State's immunity from federal taxation); *Evansville-Vanderburgh Airport Authority*, 405 U. S., at 717–721 (flat charge for each passenger enplaning, levied for the maintenance of State's airport facilities, does not run afoul of the dormant Commerce Clause). Those decisions involved constitutional provisions other than the Export Clause, however, and thus do not govern here.

*IBM* plainly stated that the Export Clause's simple, direct, unqualified prohibition on any taxes or duties distinguishes it from other constitutional limitations on governmental taxing authority. The Court there emphasized that the "text of the Export Clause . . . expressly prohibits Congress from laying any tax or duty on exports." 517 U. S., at 852; see also *id.*, at 861 ("[T]he Framers sought to alleviate . . . concerns [that Northern States would tax exports to the disadvantage of Southern States] by completely denying to Congress the power to tax exports at all."). Accordingly, the Court reasoned in *IBM*, "[o]ur decades-long struggle over the meaning of the nontextual negative command of the dormant Commerce Clause does not lead to the conclusion that our interpretation of the textual command of the Export Clause is equally fluid." *Id.*, at 851; see also *id.*, at 857 ("We have good reason to hesitate before adopting the analysis of our recent Import-Export Clause cases into our Export Clause jurisprudence. . . . [M]eaningful textual differences exist [between the two Clauses] and should not be overlooked."). In *Sperry*, moreover, we noted that the Takings Clause imposes fewer constraints on user fees than does the dormant Commerce Clause. See 493 U. S., at 61, n. 7 (analysis under Tak-

ings Clause is less "exacting" than under the dormant Commerce Clause). *A fortiori*, therefore, the Takings Clause is less restrictive than the Export Clause.

The guiding precedent for determining what constitutes a bona fide user fee in the Export Clause context remains our time-tested decision in *Pace*. *Pace* involved a federal excise tax on tobacco. Congress provided that the tax would not apply to tobacco intended for export. To prevent fraud, however, Congress required that tobacco the manufacturer planned to export carry a stamp indicating that intention. Each stamp cost 25 cents (later 10 cents) per package of tobacco. Congress did not limit the quantity or value of the tobacco packaged for export or the size of the stamped package; "[t]hese were unlimited, except by the discretion of the exporter or the convenience of handling." 92 U. S., at 375.

The Court upheld the charge, concluding that it was "in no sense a duty on exportation," but rather "compensation given for services [in fact] rendered." *Ibid.* In so ruling, the Court emphasized two characteristics of the charge: It "bore no proportion whatever to the quantity or value of the package on which [the stamp] was affixed"; and the fee was not excessive, taking into account the cost of arrangements needed both "to give to the exporter the benefit of exemption from taxation, and ... to secure ... against the perpetration of fraud." *Ibid.*

*Pace* establishes that, under the Export Clause, the connection between a service the Government renders and the compensation it receives for that service must be closer than is present here. Unlike the stamp charge in *Pace*, the HMT is determined entirely on an ad valorem basis. The value of export cargo, however, does not correlate reliably with the federal harbor services used or usable by the exporter. As the Federal Circuit noted, the extent and manner of port use depend on factors such as the size and tonnage of a vessel, the length of time it spends in port, and the services it requires, for instance, harbor dredging. See 114 F. 3d, at 1572.

370

In sum, if we are "to guard against . . . the imposition of a [tax] under the pretext of fixing a fee," *Pace* v. *Burgess*, 92 U. S., at 376, and resist erosion of the Court's decision in *IBM*, we must hold that the HMT violates the Export Clause as applied to exports. This does not mean that exporters are exempt from any and all user fees designed to defray the cost of harbor development and maintenance. It does mean, however, that such a fee must fairly match the exporters' use of port services and facilities.

\*   \*   \*

For the foregoing reasons, the judgment of the Court of Appeals for the Federal Circuit is

*Affirmed.*