**TEXPORT OIL COMPANY, Plaintiff–Cross Appellant,**

v.

**UNITED STATES, Defendant–Appellant.**

**Nos. 98–1352, 98–1353 and 98–1373.**

United States Court of Appeals, Federal Circuit.

July 27, 1999.

Rufus E. Jarman, Jr., Barnes, Richardson & Colburn, New York, New York, argued for plaintiff-cross appellant. With him on the brief was Christopher E. Pey.

John Warshawsky, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, DC, argued for defendant-appellant. With him on the brief were David M. Cohen, Director, and Jeanne E. Davidson, Assistant Director.

John J. Galvin, Galvin & Mlawski, New York, New York, argued for amicus curiae American Petroleum Institute. On the brief were G. William Frick and Andrew C. Yood, The American Petroleum Institute, Washington, DC. Of counsel was Jack D. Mlawski, Galvin & Mlawski.

Before MICHEL, CLEVENGER, and BRYSON, Circuit Judges.

CLEVENGER, Circuit Judge.

This case presents a question of interpretation of a statute that grants an exporter a refund (or "drawback") of up to 99 percent of "any duty, tax, or fee imposed under Federal law because of [the merchandise's] importation" if the exported goods are "commercially interchangeable with such imported merchandise." 19 U.S.C. § 1313(j)(2) (1994). The United States appeals from the decision of the United States Court of International Trade granting the exporter in this case, Texport Oil Company, drawbacks under section 1313(j)(2) on seven of eight disputed shipments of petroleum products. *See Textport Oil Co. v. United States*, 1 F.Supp.2d 1393 (CIT 1998). Texport Oil

Company cross-appeals the denial of its claim with respect to the eighth shipment. The United States also appeals the Court of International Trade's holding that sums paid to satisfy two non-duty charges—the Merchandise Processing Fee and the Harbor Maintenance Tax—were imposed "because of . . . importation," thus making them eligible for drawback under section 1313(j)(2).

Because we conclude that (1) the Court of International Trade's construction of the phrase "commercially interchangeable" in section 1313(j)(2) was erroneous, (2) the trial court correctly determined that the Merchandise Processing Fee is eligible for drawback, and (3) the Harbor Maintenance Tax is ineligible for drawback, we vacate-in-part, affirm-in-part, reverse-in-part, and remand.

I

The relevant provisions of 19 U.S.C. § 1313(j)(2) are as follows, with the critical language highlighted:

> (2) . . . if there is, with respect to imported merchandise on which was *paid any duty, tax, or fee imposed under Federal law because of its importation,* any other merchandise (whether imported or domestic), that—
>
> (A) is *commercially interchangeable* with such imported merchandise;
>
> . . .
>
> then upon the exportation or destruction of such other merchandise the amount of each such duty, tax, and fee paid regarding the imported merchandise shall be refunded as drawback, but in no case may the total drawback . . . exceed 99 percent of that duty, tax, or fee.

Thus, section 1313(j)(2) evinces a clear congressional purpose to allow exporters to obtain refunds on sums paid as a result of the importation of goods that, although not identical to the exported goods, are nonetheless "commercially interchangeable" with the exported goods.

The shipments at issue here [1] were exported from the United States between September 1990 and May 1991 by Texport Oil Company ("Texport"), a petroleum product marketing company extant from 1987 to 1994. After initially granting some of the claims, the United States Customs Service ("Customs") denied drawback to Texport on all the shipments upon final liquidation. Customs determined that the merchandise exported—petroleum products ranging from heating oil to jet fuel—were not "commercially interchangeable" with their corresponding imported goods. Customs also denied drawback of amounts paid under two non-duty charges, the Merchandise Processing Fee ("MPF") and the Harbor Maintenance Tax ("HMT"), reasoning that those charges were not assessed "because of [the merchandise's] importation" and thus did not fall within the ambit of section 1313(j)(2).

Texport filed suit in the Court of International Trade, which conducted a trial in mid–1997. Based on its own construction of the statutory language, the Court of International Trade determined that each of the disputed shipments were "commercially interchangeable" with their corresponding imported goods, except for one— the shipment exported onboard the *Al Deerah*—where the imported merchandise was described as "jet fuel" and the exported merchandise was listed on the sales contract as "stove fuel." *See id.* at 1399. The Court of International Trade also held that the MPF and HMT were charges assessed because of importation, and thus were eligible for drawback under section 1313(j)(2). *See id.* at 1401.

The United States appeals this decision, vesting us with jurisdiction under 28 U.S.C. § 1295(a)(5) (1994).

---

**1.** The shipments are designated by the parties according to the names of the vessels used to export the merchandise. Thus, the eight shipments are referred to as the *Boris* claim, the *Al Deerah* claim, the *Viking Venture* claim, the *Team Troma* claim, the *Pols Robinson* claim, the *Irving Eskimo* claim, the *Team Erviken* claim, and the *Nordic* claim.

■ The Court of International Trade's conclusions of law are reviewed *de novo, see, e.g., Lynteq, Inc. v. United States,* 976 F.2d 693, 696 (Fed.Cir.1992), while findings of fact are reviewed for clear error, *see Medline Indus., Inc. v. United States,* 62 F.3d 1407, 1409 (Fed.Cir. 1995). Because Customs' factual determinations are presumed to be correct, *see* 28 U.S.C. § 2639(a)(1) (1994), the challenger bears the burden of proving disputed facts. *See Universal Elecs. v. United States,* 112 F.3d 488, 492 (Fed.Cir.1997).

## II

■ The parties agree that what "commercially interchangeable" means in the context of section 1313(j)(2) is a question of statutory interpretation, an issue of law. *See, e.g., Guess? Inc. v. United States,* 944 F.2d 855, 857 (Fed.Cir.1991) (reviewing Court of International Trade's statutory interpretation de novo). Customs has not asked this court to grant its proffered interpretation of "commercially interchangeable" deference under the rule of *Chevron U.S.A. v. Natural Resources Def. Coun.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *See Avenues in Leather, Inc. v. United States,* 178 F.3d 1241, 1243–44 (Fed.Cir.1999) (noting that *United States v. Haggar Apparel Co.,* —— U.S. ——, 119 S.Ct. 1392, 143 L.Ed.2d 480 (1999), "raises questions regarding the proper standard of review of Customs' [statutory] interpretation."). In these circumstances, where Customs' conspicuous silence raises the question of whether there is an official "agenc[y] construction" of the relevant statute, we decline to sua sponte extend *Chevron* deference. *Chevron,* 467 U.S. at 842, 104 S.Ct. 2778 (deference afforded to "an agency's construction of the statute which it administers."); see also *Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 212, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) (no deference afforded to litigating position where agency's position was unclear). We thus consider the parties' arguments in this case without formal deference.

## A

■ Customs' apparent application of the language "commercially interchangeable" in section 1313(j)(2), as evidenced by the rulings that are the subject of this appeal, is to require that the exported merchandise meet what it calls "recognized industrial standards" in the same way that the imported merchandise did. That is, Customs asserts that "commercially interchangeable" requires that complete tests of the physical properties of the imported and exported goods be conducted. Here, Customs required the Texport shipments to comport with the formal requirements of the American Society of Testing and Materials ("ASTM") standards. For example, in the case of jet fuel, Customs required that 23–part ASTM standard tests be conducted on the fuel after it was loaded aboard the exporting vessel. Customs determined that the Texport shipments did not meet the "commercially interchangeable" requirements because the tests either did not fully conform to the ASTM standard (*i.e.,* they were incomplete), were conducted prior to loading the ship, or both.

The Court of International Trade found this interpretation of "commercially interchangeable" to be overly narrow, and instead held that imported and exported goods are "commercially interchangeable" under section 1313(j)(2) if they meet the following two-part test:

(1) "the imported and exported goods must be commercially accepted"; and

(2) "the description of the imported and exported goods must match on the sale invoice or contract."

*See Textport,* 1 F.Supp.2d at 1398. Texport supports this construction of the statutory language on appeal.

## B

Our review of the statutory language and the relevant legislative history leads

us, however, to conclude that neither proffered interpretation is satisfactory.

By requiring drawback to be extended to exports that were "commercially interchangeable" with dutiable imports, Congress clearly and unequivocally stated its intention to allow the benefits of drawback to extend to exports that are not identical to the imported merchandise. The scope of the difference between the imports and exports, Congress states, is limited to "commercia[l] interchangeab[ility]." 19 U.S.C. § 1313(j)(2). The phrase "commercially interchangeable" was inserted in place of the term "fungible" in a 1993 amendment, *see* Pub.L. 103–182, § 632(a)(4), 1993 U.S.C.C.A.N. (107 Stat.) 2193–94, ruling out any construction of "commercially interchangeable" that requires the imports and exports to be identical (or even very nearly so); *compare* 19 U.S.C. § 1313(j)(2) (1988) (amended), *with* 19 U.S.C. § 1313(j)(2) (1994); *see also* H.R.Rep. No. 103–361, at 131 (1993), reprinted in 1993 U.S.C.C.A.N. 2552, 2681 ("[T]he Committee intends to permit the substitution of merchandise when it is 'commercially interchangeable' rather than 'commercially identical.'"). This precludes our acceptance of Customs' interpretive position, as it would require not "interchangeability," but "identity." Instead, we are convinced that Congress intended "commercially interchangeable" to be an objective, market-based consideration of the primary purpose of the goods in question. *See, e.g.,* S.Rep. No. 103–189, at 83 (noting intention to create objective, fact-based standard); H.R.Rep. No. 103–361, at 131 (1993), reprinted in 1993 U.S.C.C.A.N. 2552, 2681. Therefore, "commercially interchangeable" must be determined objectively from the perspective of a hypothetical reasonable competitor; if a reasonable competitor would accept either the imported or the exported good for its primary commercial purpose, then the goods are "commercially interchangeable" according to 19 U.S.C. § 1313(j)(2).

Although we commend the Court of International Trade for recognizing the "commercial practicability and market re-ality" undergirding the "commercially interchangeable" standard, *see Textport,* 1 F.Supp.2d at 1398, we are concerned that its two-part test (stated above) may be insufficiently objective and thus prone to manipulation. Basing the analysis on the activities of the particular parties to the dispute by requiring only that the goods must be commercially accepted and identically described might encourage parties to import and export goods under the broadest (and vaguest) descriptions possible, so as to increase the opportunity to claim drawback under section 1313(j)(2). Instead, we think that a firmly objective standard—analyzed from the perspective of a hypothetical reasonable competitor—avoids these concerns.

Whether two particular sets of merchandise are "commercially interchangeable," under the objective standard we discern above, raises a factual question. Evidence relevant to this question would, of course, include "governmental and recognized industrial standards, part numbers, tariff classification, and relative values." *See, e.g.,* H.R.Rep. No. 103–361, at 131 (1993), reprinted in 1993 U.S.C.C.A.N. 2552, 2681. This analysis might also include evidence of arms-length negotiations between commercial actors, the description of the goods on bills of sale or invoices, *see Textport,* 1 F.Supp.2d at 1398, as well as other factual evidence presented by the parties that the Court of International Trade considers relevant. *See, e.g., NEC Corp. v. United States,* 151 F.3d 1361, 1375 (Fed.Cir.1998) (reviewing Court of International Trade's evidentiary determination for abuse of discretion). We therefore vacate the trial court's judgments with respect to all eight claims on appeal, and trust that the parties, on remand, will take the opportunity to develop a factual record for each claim supporting their position under the interpretation of 19 U.S.C. § 1313(j)(2) we outline above.

### III

Under 19 U.S.C. § 1313(j)(2), drawback is available for "any duty, tax, or fee im-

posed under Federal law because of [the merchandise's] importation." Customs refused to grant drawback to Texport on two separate charges that were paid by Texport upon importation: the Merchandise Processing Fee ("MPF") and the Harbor Maintenance Tax ("HMT"). The Court of International Trade held that both the MPF and the HMT were assessed "because of [the merchandise's] importation" and are thus eligible for drawback, a conclusion that Customs disputes on appeal.

Once again, the parties agree that this is a question of statutory interpretation. And again, Customs has not asked this court to grant it *Chevron* deference on this point; thus, for the reasons stated above, we again consider the parties' arguments without formal deference.

### A

■ The MPF, charged "for the provision of customs services," and "[f]or the processing of merchandise that is formally entered or released during any fiscal year," is assessed pursuant to 19 U.S.C. § 58c(a)(9) (1994). Customs argues that this charge, because it is intended to reimburse Customs for costs incurred in the processing of imported and exported goods, is unlike the types of taxes, duties, and fees referred to in section 1313(j)(2). Customs posits that Congress could not have intended for the MPF to be eligible for drawback, for doing so would reduce the sums that Customs collects to cover its direct costs. We are unpersuaded. The statute affords drawback if the following two conditions are met:

(1) the charge is "any duty, tax, or fee assessed under Federal law"; and

(2) the charge is assessed "because of . . . importation."

19 U.S.C. § 1313(j)(2). Customs does not suggest that either condition is not met with respect to the MPF. Nor could it: the MPF is clearly a fee assessed under Federal law, and is explicitly linked to import activities. Thus, it is well within the scope of section 1313(j)(2)'s grant of drawback.

Customs' arguments relating to the policies of drawback are unavailing. We note that section 1313(j)(2) appears to respond to Customs' concerns that granting drawback will deprive Customs of revenue by limiting the drawback amounts to 99 percent of the original "duty, tax, or fee" collected. 19 U.S.C. § 1313(j)(2). To the extent that Customs believes that the remaining one percent is insufficient to cover the costs incurred by its operations, that argument is better addressed to Congress.

The Court of International Trade correctly determined that the MPF was eligible for drawback under section 1313(j)(2).

### B

■ The HMT, charged "for any [water]port use," is authorized by 26 U.S.C. § 4461 (1994). The statute specifically notes that the HMT is to be assessed against three types of parties: importers, exporters, and shippers. Customs argues that the HMT is not eligible for drawback because it is assessed against all shipments, regardless of whether they are imports. We agree.

As we noted above, charges eligible for drawback under section 1313(j)(2) must be (1) any duty, tax, or fee assessed under Federal law, and (2) assessed because of a good's importation. Condition (1) is plainly satisfied here, so the dispositive question is whether the HMT is assessed "because of . . . importation." 19 U.S.C. § 1313(j)(2). This language, we think, is best read as limiting the scope of the charges eligible for drawback to only those with a substantial nexus to the importation of merchandise. We thus read the "because of . . . importation" clause to require a nexus between the assessed charges and the act of importation, and therefore preclude the grant of drawback to a duty, tax, or fee that is assessed in a nondiscriminatory fashion against all shipments utilizing ports. The purpose of drawback is to place those who export from the United States on an equal footing with overseas competitors, by largely refunding the sums

paid to import certain materials, thus eliminating or diminishing the cost disadvantage resulting from the presence of import duties, taxes, or fees. This purpose does not require the refund of generalized Federal charges; we do not think Congress intended section 1313(j)(2) to grant a broad tax break to exporters.

The HMT is a generalized Federal charge for the use of certain harbors. *See* 26 U.S.C. § 4461. It is intended to be assessed independently of whether the "port use" is for imports, exports, or other shipments; a shipment unloaded in Savannah is charged the same HMT whether its origin is San Francisco or Singapore. *See, e.g.,* 19 C.F.R. § 24.24(b)(1) (listing ports where HMT is assessed). Thus, it does not have the necessary nexus to the importation of goods to qualify it for drawback under section 1313(j)(2). In *United States v. United States Shoe Corp.,* 523 U.S. 360, 118 S.Ct. 1290, 140 L.Ed.2d 453 (1998), the Supreme Court held that the HMT was unconstitutional when assessed against exports. In doing so, the Court held that the HMT is not "a fair approximation of services, facilities, or benefits furnished to the exporters" and is therefore an impermissible export duty rather than a more benign user fee. *See id.* at 363, 118 S.Ct. 1290. This does not alter our conclusion. In *U.S. Shoe,* the Supreme Court noted that its analysis did *not* turn on whether the charge was "generally applicable or nondiscriminatory" in application to imports, exports, and other shipments. *Id.* at 367, 118 S.Ct. 1290 ("[T]he Export Clause allows no room for a federal tax, however generally applicable or nondiscriminatory, on goods in export transit."). In contrast, our decision turns on this very issue. That the HMT charge does not fairly reflect the actual costs of port use, *see id.* at 369, 118 S.Ct. 1290 (noting that the ad valorem basis of the HMT "does not correlate reliably with the federal harbor resources used or usable by the exporter"), is simply irrelevant to our analysis. The HMT could be a flat (or even wholly arbitrary) fee—as long as it was assessed in a general and nondiscriminatory manner among

all shipments, regardless of their status as imports or otherwise, our conclusion would be the same.

The Court of International Trade erred in concluding that the HMT was eligible for drawback under 19 U.S.C. § 1313(j)(2).

## CONCLUSION

For the reasons stated above, we vacate the judgments of the Court of International Trade relating to whether Texport's exported goods are "commercially interchangeable" with their corresponding imports. We affirm the judgment that the MPF is eligible for drawback, and reverse the judgment that the HMT is similarly eligible. The case is remanded to the Court of International Trade for further proceedings not inconsistent with this opinion.

## COSTS

No costs.

*AFFIRMED–IN–PART, VACATED–IN–PART, REVERSED–IN–PART, AND REMANDED.*