**Slip Op. 03-140**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: RICHARD W. GOLDBERG, SENIOR JUDGE**

THE PILLSBURY COMPANY,

    Plaintiff,

     v.       Court No. 98-03190

UNITED STATES,

    Defendant.

[Judgment in part for plaintiff.]

                October 27, 2003

Neville Peterson LLP (John M. Peterson, George W. Thompson, Mollie R. Coyne) for plaintiff The Pillsbury Company.

Peter D. Keisler, Assistant Attorney General; Barbara S. Williams, Acting Attorney in Charge; Saul Davis, Civil Division, Commercial Litigation Branch, United States Department of Justice; Edward M. Maurer, Office of Assistant Chief Counsel, International Trade Litigation, United States Bureau of Customs and Border Protection, Of Counsel, for defendant United States.

**OPINION**

**GOLDBERG, Senior Judge:** Plaintiff The Pillsbury Company ("Pillsbury") filed this action to challenge the denial of its substitution unused merchandise drawback claims (the "drawback claims") made pursuant to 19 U.S.C. § 1313(j)(2) (2000). The drawback claims were made with respect to asparagus imported from Mexico, and asparagus grown in Washington State and exported to

Canada.  The Court has jurisdiction pursuant to 28 U.S.C. §
1581(a).

## I.  BACKGROUND

From 1991 through 1993, Pillsbury imported into the United
States asparagus from Mexico (the "designated asparagus").  The
Customs Service ("Customs")[1] classified the subject items under
subheading 0709.20.90.00 of the Harmonized Tariff Schedule of the
United States ("HTSUS") as "Other vegetables, fresh or chilled:
asparagus."  Customs assessed duties at liquidation on the
imported asparagus, and Pillsbury paid the assessed duties.  In
addition, in 1992 and 1993, Pillsbury exported from the United
States to Canada asparagus grown in Washington State (the
"substitute asparagus").

During this period, the asparagus season began in January
and February of each year when asparagus first came on the market
from Mexico.  At the beginning of the asparagus season, demand
outpaced the market's supply of asparagus.  Thus, the asparagus
offered in January obtained a high price of $100 per thirty-pound
crate.  Transcript of Trial Proceedings on Oct. 2-4, 2002 ("Tr.")
at 53.  By late April, the Washington State asparagus entered the

---

[1]  The United States Customs Service has since become the
Bureau of Customs and Border Protection per the Homeland Security
Act of 2002, § 1502, Pub. L. No. 107-296, 116 Stat. 2135, 2308-09
(Nov. 25, 2002), and the Reorganization Plan Modification for the
Department of Homeland Security, H.R. Doc. 108-32, p. 4 (Feb. 4,
2003).

market. There was a significant volume of asparagus on the market by the time the Washington State asparagus were being produced. The later Washington State asparagus received the lowest price of the season, as little as $25 per crate. Tr. at 53-57, 281, 382.

As the asparagus were harvested, they were sold either to wholesale and retail markets that resell the asparagus in its fresh condition (the "fresh market") or to processors who froze or canned the asparagus (the "processed market"). The designated asparagus were fresh when imported, and the substitute asparagus were fresh when exported. Processors and the fresh market purchasers received the same quality asparagus on any given day, packed to different specifications. Tr. at 354. Occasionally, a fresh market wholesaler or retailer would purchase asparagus for the fresh market, and later freeze or can the asparagus. Tr. at 183-84. Whether asparagus was processed or sold on the fresh market depended upon the price of asparagus: if the price of asparagus was high, then the asparagus would rarely be sold to canners because canners could not recover the high price paid for the fresh asparagus; if the price of asparagus was low, then the canners purchased and processed the asparagus because they could recover the price paid for the asparagus.

Pillsbury timely filed 249 substitution unused merchandise drawback claims with the Port Director of Customs in Chicago in

1994 and 1995.  A substitution unused drawback claim is for exports of goods that are "commercially interchangeable" with the imported goods.  In the instant case, Pillsbury requested a refund of the duties paid on the designated asparagus when the substitute asparagus were exported.

Pillsbury's drawback claims were denied in November 1996. In January 1997, Pillsbury filed protests 3901-97-100290, 3901-97-100299, 3901-97-100306, 3901-97-100319, and in February 1997 filed protest 3901-97-100389[2], disputing Customs' refusal to pay drawback on the subject claims.  On November 16, 1998, Customs denied Pillsbury's protests, stating:

> Lead Protest 3901-97-100320.  Ruling 227491, dated
> 10/9/98, held that there is insufficient evidence to
> find that the imported asparagus and the substituted
> exported asparagus were "commercially interchangeable."

Protest Nos. 3901-97-100290, 3901-97-100299, 3901-97-100306, 3901-97-100319, 3901-97-100389.

Pillsbury filed its summons with the Court of International Trade on December 4, 1998, challenging Customs' denial of Pillsbury's protests.  Upon the parties' joint motion for trial,

---

[2]  Customs failed to date stamp the February 1997 protest from Pillsbury when it was received.  Although Pillsbury produced a copy of a letter dated just within the ninety day time limit for filing a protest, Customs insisted that without the stamp date Pillsbury's protest was not timely made.  Tr. at 4-6, 432-33.  Customs' error is the sole cause of Pillsbury's inability to prove the timeliness of its February protest; therefore, the Court rules that the protest was timely filed.

the Court held trial in Seattle, Washington and New York in October 2002.[3]

## II. STANDARD OF REVIEW

Customs's decision enjoys a statutory presumption of correctness, and the burden of proving otherwise rests upon the party challenging such decisions. 28 U.S.C. § 2639(a). However, the presumption of correctness "does not add evidentiary weight; it simply places the burden of proof on the challenger." Anhydrides & Chems., Inc. v. United States, 130 F.3d 1481, 1486 (Fed. Cir. 1997). The presumption of correctness applies only to the factual basis of such decisions, and not to their legal component, with respect to which the Court of International Trade

---

[3] In its opening statement, counsel for the government made certain allegations attacking the good faith intentions of the plaintiff. Government counsel alleged that counsel for Pillsbury had somehow participated in the grading process and that the participation was "done specifically for purposes of litigation." Tr. at 33, 34. The accusation was that "the actual grading process for this litigation was set-up by [Pillsbury's] attorneys with the intent of setting it up for Customs, for the litigation, and not as a commercial practice." Tr. at 38. Government counsel later clarified that the set-up was by another law firm for another legal matter. Tr. at 40.

The subject of the allegation had years before been settled. The current litigation was filed some four years after the matter referred to by government counsel. The matter was clearly irrelevant; hardly "a set-up" as alleged.

The Court can only conclude that the government was trying to improperly influence the Court into believing that the plaintiff entered with unclean hands. This type of behavior is unacceptable.

exercises <u>de novo</u> review. See <u>Universal Elecs., Inc. v. United States</u>, 112 F.3d 488, 492 (Fed. Cir. 1997).

## III. DISCUSSION

The sole issue of law presented in the instant case is whether Pillsbury's designated asparagus and substitute asparagus are "commercially interchangeable" within the meaning of the substitution unused drawback statute, 19 U.S.C. § 1313(j)(2). 19 U.S.C. § 1313(j)(2) provides that:

(j)  Unused Merchandise Drawback –

*       *       *

(2)  If there is, with respect to any imported merchandise on which was paid any duty, tax, or fee imposed under Federal law because of its importation, any other merchandise (whether imported or domestic), that –

(A)  Is commercially interchangeable with such imported merchandise;

(B)  Is, before the close of the 3-year period beginning on the date of importation of the imported merchandise, either exported or destroyed under Customs supervision; and

(C)  Before such exportation or destruction –

(i)  Is not used within the United States, and

(ii) Is in the possession of, including ownership while in bailment, in leased facilities, in transit to, or in any other manner under the operational control of, the party claiming drawback under this paragraph, if that party

(I)  Is the importer of the imported merchandise, or

> > (II) Received from the person who imported
> > and paid any duty due on the imported
> > merchandise a certificate of delivery
> > transferring to the party the imported
> > merchandise, commercially
> > interchangeable merchandise or any
> > combination of imported and commercially
> > interchangeable merchandise (and any
> > such transferred merchandise, regardless
> > of its origin, will be treated as the
> > imported merchandise and any retained
> > merchandise will be treated as domestic
> > merchandise);

> Then upon the exportation or destruction of such other
> merchandise the amount of each such duty, tax and fee
> paid regarding the imported merchandise shall be
> refunded as drawback, but in no case may the total
> drawback on the imported merchandise, whether available
> under this paragraph or any other provision of law or
> any combination thereof, exceed 99% of that duty, tax,
> or fee.

19 U.S.C. § 1313(j)(2).

Section 1313(j)(2) was enacted as part of Section 632 of the North American Free Trade Agreement Implementation Act, Pub. L. 103-182 (Dec. 8, 1993).  The substitution unused merchandise drawback system set forth therein replaced the former system of "substitution same-condition drawback."  The old system required that the imported and exported goods be "fungible," that is, "merchandise which for commercial purposes is identical and interchangeable in all situations."  See, e.g., 19 U.S.C. § 1313(j) (1988), 19 C.F.R. § 191.2(b)(1) (1990).  The new system is "less restrictive," only requiring that the imported and

substitute goods be "commercially interchangeable."  See H. Rep.

No. 103-361, 103rd Cong., 1st Sess. 131 (1993).

The Court of Appeals for the Federal Circuit defined

"commercially interchangeable" in Texport Oil Co. v. United

States, 185 F.3d 1291 (Fed. Cir. 1999).  The Federal Circuit

stated that:

> Indeed, we are convinced that Congress intended
> "commercially interchangeable" to be an objective,
> market based consideration of the primary purpose of
> the goods in question.  Therefore, "commercially
> interchangeable" must be determined objectively from
> the perspective of a hypothetical reasonable
> competitor; if a reasonable competitor would accept
> either the imported or the exported good for its
> primary commercial purpose, then the goods are
> "commercially interchangeable" according to 19 U.S.C.
> Section 1313(j)(2).

Texport, 185 F.3d at 1295 (internal citations omitted)

(hereinafter the "Texport test").  Thus, the Court must determine

whether a reasonable hypothetical competitor would accept either

the imported or the exported asparagus for asparagus's primary

commercial purpose.  If the answer is yes, then the imported and

exported asparagus are commercially interchangeable.

In the context of the instant case, a reasonable

hypothetical competitor of Pillsbury will import and export

asparagus for the fresh market and the processed markets.  The

primary purpose for asparagus is for human consumption as food.

Customs argues that this definition is too broad, and that the

definition implies that apples, peaches, and all other food

products would be commercially interchangeable with asparagus.

Since the <u>only</u> purpose for asparagus is for human consumption as

food, and the drawback claims are limited to asparagus, the Court

finds no barrier to concluding that the primary purpose for

asparagus is for human consumption as food.

To determine whether both the imported and exported

asparagus would be accepted by the hypothetical reasonable

competitor of Pillsbury, there are several factors to consider.

The Federal Circuit has identified the following evidentiary

factors:

> Evidence relevant to this question would, of course,
> include "governmental and recognized industrial
> standards, part numbers, tariff classification, and
> relative values."  See, e.g., H.R. Rep. 103-361, at 131
> (1993), reprinted in 1993 U.S.C.C.A.N. 2552, 2681.
> This analysis might also include evidence of arms-
> length negotiations between commercial actors, the
> description of the goods on bills of sale or invoices .
> . . as well as other factual evidence presented by the
> parties that the Court of International Trade considers
> relevant.[4]

<u>Texport</u>, 185 F.3d at 1295.

<u>Texport</u> also cautioned that the appropriate comparison is

between the imported designated asparagus in its condition <u>as</u>

<u>imported</u>, and the exported substitute asparagus in its condition

---

[4]  The legislative history cited by the Federal Circuit in
<u>Texport</u> specifically mentions government and industry standards,
part numbers, the tariff classification, and relative values as
relevant evidence to determine commercial interchangeability.
However, this list is not intended to be exhaustive, nor is any
one item in the list dispositive.

as exported. <u>Texport</u>, 185 F.3d at 1291 (Title to the exported jet fuel had passed to the purchaser, and thus whatever the buyer did to the jet fuel after that point was "out of Customs' province of inquiry into commercial interchangeability."). Changes to the merchandise effected after importation or exportation are outside the scope of the <u>Texport</u> test. Therefore, it is irrelevant whether Pillsbury's customer sells the asparagus on the fresh market, or cans, freezes, or jars it.

Thus, commercial interchangeability is determined by an "objective, market-based consideration of the primary purpose of the goods in question." <u>Texport</u>, 185 F.3d at 1295. Based on the relevant facts, the Court must determine whether a reasonable hypothetical competitor would accept both the substitute exported asparagus and the designated imported asparagus based on government and industry standards, tariff classifications, relative values of the exported and imported asparagus, the invoice descriptions, and the preparation and packaging of the asparagus.

## A.   **Government and Industry Asparagus Standards**

Pillsbury introduced evidence that all of the imported asparagus in this action were USDA Grade No. 2 or better.[5]

---

[5]   Standards established by the U.S. Department of Agriculture ("USDA") are used throughout the asparagus industry in the United States. Tr. at 51, 185. The USDA No. 1 standard requires that the asparagus stalk be at least one-half inch in diameter. No less than two-thirds of the stalk length must be of

However, the Texport test is based on an "objective, market based

consideration."  There was little credible evidence that the

market contracts to purchase asparagus on the broad "Grade 2 or

better" standard.  Although the USDA Grade specifications weigh

in favor of ruling that the designated and substitute asparagus

are commercially interchangeable, less weight is given to this

factor and more weight is given to the industry standards.

    Instead of relying on USDA standards, the designated and

substitute asparagus were traded on contract standards specific

to individual labels.[6]  The record evidence demonstrates that

---

green color.  A ten-percent stalk tolerance is permitted, meaning
that ten percent of the lot does not need meet the requirements
for the USDA No. 1 standard.  The USDA No. 2 standard requires
that the asparagus stalk be at least five-sixteenths inch in
diameter and not less then one-half of the stalk must be green.
The USDA No. 2 standard also permits a ten-percent stalk
tolerance.  US Standards for Grades of Fresh Asparagus, 7 C.F.R.
§ 2851.3721.  The USDA standards do not have any requirements for
the length of the asparagus spear.  Tr. at 49.

    [6]  The designated asparagus were imported under a variety of
Pillsbury labels, each label with its own commercial grading
specifications.  Empacadora imported asparagus under the Green
Giant, County Kist, King Spear, and Mr. Lucky labels.  Green
Giant's specifications were the most stringent, and were much
stricter than the USDA Grade No. 1 standards.  Pillsbury's County
Kist label had stricter requirements than USDA No. 2.  County
Kist required 85 percent green with a 10-percent tolerance,
although no spear could be more than 1/3 white in color.  Tr. at
144-49.  Asparagus packed under the King Spear and Mr. Lucky
labels were permitted to have more white material on the spears
that those spears packed under the Green Giant or County Kist
labels.  Tr. at 189, 190-91, 195, 200-02.  King Spear and Mr.
Lucky labels only required 66 percent of the stalk length to be
green.  Tr. at 147.  Each label would, at times, request
different diameters of asparagus representing jumbo, extra large,
large, standard, and small.  Tr. at 207.

many of the contract standards were stricter than USDA Grade No. 2, and were often more stringent than USDA Grade No. 1. The contract standards also had various requirements for the length of the asparagus spear, which the USDA grading does not specify. Despite the differences in contract standards, the evidence shows that the actual lengths of the designated and substitute asparagus spears were roughly the same.

Evidence of different contract standards would indicate that the designated and substitute asparagus are not commercially interchangeable. However, this factor must be analyzed in the context of a reasonable hypothetical competitor of Pillsbury, and the primary purpose of asparagus for human consumption. A hypothetical reasonable competitor of Pillsbury will import asparagus both for the processed and fresh markets, the final destination dependent upon the supply and price of the asparagus.

---

The substitute asparagus were not graded. Instead, a "usable percentage" was calculated based on the Dayton grade specifications. Tr. at 451. The Dayton grading system, as applied by Pillsbury to the substitute asparagus, was as follows: (1) "A" spears are those with a 3/4 inch or larger diameter measured 5-1/2 inches from the tip; (2) "B" spears are spears with a 5/16 to 3/4 inch diameter measured 5-1/2 inches from the tip; and (3) "C" spears are both A and B spears with a minor defect. The A, B, and C spears must have a minimum of 5-1/2 inches of green color. "Culls" are defective fresh asparagus, with broken, flowered or spread spears. Although culls are still fresh asparagus and are edible, they are not acceptable for the fresh or processed markets. They are less than 3/8 inch in diameter when measured 5-1/2 inches from the tip. Tr. at 396-97; Plaintiff's Exhibit 30 (Asparagus Raw Product Grade Specifications, Dayton, Washington).

The primary purpose of asparagus is for human consumption, a purpose that is not altered by canning, freezing, jarring, or selling asparagus on the fresh market.  A reasonable hypothetical competitor of Pillsbury would accept the designated and substitute asparagus for either the fresh market or for the processed market.

## B.    Tariff Classification

The asparagus shipped to Canada and the imported Mexican asparagus are both classified under HTSUS 0709.20.90.00.  This weighs in favor of concluding the asparagus is commercially interchangeable.

## C.    Relative Values of the Designated and Substitute Asparagus

The relative values of the designated and substitute goods are usually a reliable indicator of whether goods are commercially interchangeable.  In the instant case, however, the relative values are much less useful.  The values of the imported and exported asparagus, as reflected in the invoices, cannot be directly compared.  Several witnesses testified that asparagus prices early in the season are much higher than the asparagus prices when Washington State is in production.  The price difference is not due to quality differences, but rather is due to the supply of asparagus in the marketplace.

An additional element to the price difference is the packing costs.  The packing costs for asparagus were a significant

percentage of the cost of the asparagus. Tr. at 144, 242-244.

Packing types and costs are different for asparagus destined for

the fresh market and asparagus for the processed market. It was

more expensive to pack asparagus for the fresh market because

they were packed in non-reusable crates, the asparagus were of

uniform size and length, and the asparagus were often bunched.[7]

Tr. at 159, 233-36, 295-96. Although not typical, customers who

ordered the asparagus bunched for the fresh market would accept

unbunched asparagus. Tr. at 102-03, 126, 336. The substitute

asparagus were shipped in totes or lugs, rather than disposable

cardboard boxes or wooden crates, because the totes and lugs can

be recycled, and thus packing costs were reduced. Tr. at 394,

424. Asparagus shipped to the processed market were usually

shipped in reusable totes or lugs, which constituted a very small

portion of the asparagus price.

Because the evidence at trial showed that price differences

in asparagus are not based on the quality of the asparagus, but

rather on the supply of asparagus in the market, this factor does

not detract from the conclusion that the designated and

substitute asparagus are commercially interchangeable. Instead,

because testimony at trial showed that the asparagus quality did

not vary throughout the asparagus growing season, this factor

---

[7] Bunched asparagus are typically 18 to 20 asparagus spears, roughly equivalent to a pound of asparagus, banded together in a bunch.

reinforces the conclusion that the designated and substitute asparagus are commercially interchangeable.

**D.    Invoice Descriptions**

The designated asparagus and the substitute asparagus were described in the commercial invoices as "fresh asparagus." See, e.g., Drawback Entry Number TH7-0092135-6 (May 8, 1995).  This is not surprising since all asparagus, even culls, are "fresh asparagus" until processed.

**E.    Preparation and Packaging of Asparagus**

An important factor in determining the commercial interchangeability of the subject asparagus is the preparation and packaging of the asparagus.

When harvested, the designated asparagus was cut to a length of eight to ten inches in the field.  After the initial field cut, the picker gathered a handful of asparagus and made another "butt cut" to make the length of the asparagus uniform.  There was also an initial culling process in the field, whereby the obviously defective asparagus were left in the field.  Tr. at 92. The designated asparagus were washed, graded, sized, machine trimmed to length specifications, packaged in crates, labeled, and hydrocooled for preservation.  Tr. at 62-65, 68-69, 82, 247. The designated asparagus were packed either loose or bunched. Tr. at 65, 182.  The designated asparagus that are the basis of

the disputed drawback claims were sold both to the fresh market and to processors.  Tr. at 72, 144, 183-84.

The substitute asparagus were processed less than the designated asparagus.  The substitute asparagus were trimmed twice in the field by the pickers, and then placed in bins, similar to the harvesting of the designated asparagus.  There was also an initial culling process in the field whereby the obviously defective asparagus were left in the field.  After the substitute asparagus were brought to the shed they were simply hydrocooled, and no further processing was done.  Tr. at 387-95.

Clearly, there were several differences in the preparation and packaging of the designated and substitute asparagus.  Customs maintains that because the designated asparagus were washed, graded, sized, machine trimmed, packed in crates, and labeled, the designated asparagus were no longer commercially interchangeable with the substitute asparagus, which were only culled and trimmed in the fields, and hydrocooled.  Nonetheless, the asparagus remained fresh asparagus.  Also, witnesses testified that some designated asparagus originally destined for the fresh market were redirected to the processed market.  Any bunching or crating of asparagus did not change the condition of the asparagus, or disqualify it from a particular use.  Functionally, the level of processing and the type of packaging did not restrict the asparagus to a specific market.  Thus, the

processing and packaging of asparagus have little impact on their commercial interchangeability.

Based on the Court's examination of government and industry standards, tariff classification, relative values, invoice descriptions, preparation and packing of asparagus, and all other testimony and admitted exhibits, the Court concludes that the designated and substitute asparagus are commercially interchangeable.  A reasonable, hypothetical competitor of Pillsbury would accept either the imported Mexican asparagus or the exported Washington State asparagus for human consumption, its primary purpose.

## G.    Calculation of Drawback

Although the designated and substitute asparagus are commercially interchangeable, Pillsbury cannot receive the full amount of the claimed drawback.  At trial, it was established that the usual commercial practice was to trim asparagus to a length that left an 18-percent "trim."  Testimony at trial indicated that one inch of an asparagus spear is roughly equal to 18 percent of the total weight of the asparagus spear.  In the instant case, Pillsbury shipped asparagus in lengths of 7-1/2 to 10 inches to Fraser Valley.  This amounts to 2 to 4-1/2 inches of trim, or waste, being shipped to Canada.  The documents attached to the drawback claims reflect the large amount of waste: they indicate that approximately 50 percent of the asparagus weight

shipped to Canada was waste.[8]  What Fraser Valley did with the asparagus is irrelevant to the issue of commercial interchangeability.  It is relevant, however, to the issue of the amount of drawback claimed given that Fraser Valley only paid for the 5-1/2 inches of usable asparagus.[9]

Fraser Valley paid for the "usable poundage," or the weight of the first 5-1/2 inches of each asparagus spear.  In a normal commercial situation, 6-1/2 inches of asparagus would be shipped to Fraser Valley to protect the end of the asparagus spear from becoming tough.  Thus, the amount of asparagus exceeding 6-1/2 inches in length was excess waste, essentially packing material.  The weight of the asparagus spear beyond the 6-1/2 inch length is not eligible for drawback.  Accordingly, Pillsbury is eligible to claim drawback for 6-1/2 inches of each asparagus spear.

## IV.  CONCLUSION

The preponderance of the record evidence establishes that Customs erred in denying Pillsbury's claims for drawback.  The

---

[8]  The Court is not in a position to determine the exact percentage of waste based on the documents submitted to the Court.

[9]  Pillsbury claims that Fraser Valley paid a higher per usable pound price to offset the fact that Fraser Valley was only paying for a percentage of the shipped weight.  No evidence was presented at trial to show that Fraser Valley paid a higher per usable pound price.  Since Pillsbury did not meet its burden of establishing a higher asparagus price for Fraser Valley, the Court is unwilling to infer that a higher price was charged.

record evidence also establishes that Pillsbury is only entitled

to a portion of the claimed drawback, as discussed <u>infra</u>.


_____
**Richard W. Goldberg**
**SENIOR JUDGE**


**Date:      October 27, 2003**
**New York, New York**