# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

October 5, 2007

Charles R. Fulbruge III
Clerk

No. 06-30672

F MICHAEL CUSTER; MARSHA F CUSTER

Plaintiffs - Appellants

v.

MURPHY OIL USA INC, formerly known as Murphy Oil Corp

Defendant - Appellee

Appeal from the United States District Court
for the Eastern District of Louisiana

Before REAVLEY, GARZA, and DENNIS, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

We GRANT the Petition for Rehearing filed by defendant Murphy Oil USA, Inc., and having duly considered the response, we withdraw the prior panel opinion, 493 F.3d 626, in its entirety and substitute the following:

In December 2003, Michael Custer ("Custer") had an accident at his home and, as a result, suffered a ruptured disk in his neck. Custer was totally disabled and unable to return to work. When Custer inquired about medical coverage from his employer, Murphy Oil USA, Inc. ("Murphy"), he was informed that because he was totally disabled his employment would be terminated and he would no longer qualify for coverage under the Group Insurance Plan for Employees of Murphy Oil Corp. ("the Plan"). Under the Plan in effect prior to

2003, Custer would have been covered until he turned 65. Murphy contends that the Plan was modified in January 2003, therefore allowing Custer's coverage to end when he was terminated. Custer and his wife, Marsha Custer, ("the plaintiffs") challenge the modifications to the Plan by alleging that Murphy did not comply with the Employment Retirement Insurance Security Act's ("ERISA"), 29 U.S.C. § 1001 et seq., reporting and disclosure requirements and did not comply with the Plan's modification procedures. Further, the plaintiffs allege that Murphy's decision to terminate Custer's employment interfered with Custer's attainment of rights protected under ERISA.

I

Custer worked at Murphy from 1979 to 2004. He started as an H-operator but, by 1997, he had worked his way up to shift foreman at Murphy's plant in Meraux, Louisiana. This promotion made Custer a salaried employee and he became eligible for the Plan. The Plan is a self-funded group health plan administered by the Employee Benefit Committee ("Benefit Committee"). In November 2002, the Benefit Committee met to consider changes to the Plan's benefits, specifically relating to the long term benefits for employees who become totally disabled and are unable to work. At the time, the Plan allowed employees who became totally disabled, and whose employment was terminated as a result, to receive benefits until the age of 65.[1] The Benefit Committee agreed to make changes, limiting benefits of totally disabled employees to COBRA Continuation coverage for 18 months.

Although the Benefit Committee agreed to the changes, they were still pending approval from the corporate office when the Employee Benefits

---

[1] The language of that plan stated, "If the employee is totally disabled and approved to receive benefits under the Company-sponsored Long Term Disability Plan or Social Security, the employee and dependents may continue to be covered by this Plan until the employee is age 65, provided he or she remains disabled and is not eligible for or covered by another group plan."

Department ("the Benefits Department") sent Murphy's annual open enrollment notice to all eligible employees in November 2002. Instead of announcing the proposed changes, the notice only announced the possibility that changes will follow. Murphy claims that the corporate office approved the changes in early December 2002 and that, immediately thereafter, the Benefits Department mailed a written notice to all active employees notifying them of various changes to the Plan which would be effective on January 1, 2003. Although Murphy claims it mailed this notice to Custer at his then-present address, the plaintiffs contend that they never received the December 2002 notice. In March 2003, Murphy asserts it mailed a new Summary Plan Description ("SPD") to all active employees, which included two sections relating to the coverage for disabled and terminated employees. The plaintiffs attest that they did not receive the SPD either.

On December 19, 2003, Custer was injured while moving boxes in his attic. Apparently, the attic stairs collapsed; he fell eight feet and ruptured the disks in his neck. As a result of the accident, he was totally disabled and immediately went on a leave of absence from work. On January 22, 2004, the Benefits Department sent Custer a letter explaining how some aspects of his benefits would be affected by his leave of absence, and included some forms which he filled out and returned on January 28, 2004. On May 25, 2004, the Benefits Department sent Custer another set of forms, which were returned completed. In June of 2004, Custer called Murphy to inquire about his benefits and was told that his employment could be terminated due to his disability and therefore he would be no longer covered under the Plan, as amended in January 2003. Custer claims that this was the first he had heard of these amendments.

Eventually, Custer was terminated from his employment on September 30, 2004. The Benefits Department notified Custer that his medical coverage ended

when he was terminated but also informed him that he was eligible for COBRA Continuation coverage, which ended in April 2006.

The plaintiffs filed suit against Murphy in March 2005, seeking a declaratory judgment and damages under the pre-2003 version of the Plan. After delays due to Hurricane Katrina, Murphy moved for summary judgment in April 2006. The plaintiffs opposed the motion and filed a cross-motion for summary judgment, but in June 2006 the district court granted summary judgment to Murphy on all claims and denied the plaintiffs' cross-motion for summary judgment.

## II

"We review grants of summary judgment de novo, applying the same legal standard used by the district court." Chacko v. Sabre Inc., 473 F.3d 604, 609 (5th Cir. 2006). Summary judgment is appropriate if the moving party can show "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In making this determination, we evaluate the facts in the light most favorable to the non-moving party)) in this case, the plaintiffs. Keszenheimer v. Reliance Std. Life Ins. Co., 402 F.3d 504, 507 (5th Cir. 2005).

## A

The plaintiffs first argue that Murphy's December 2002 notice did not comply with ERISA's reporting and disclosure requirements. ERISA requires that "[a] summary of any material modification in the terms of the plan . . . shall be written in a manner calculated to be understood by the average plan participant and shall be furnished in accordance with section 1024(b)(1) of this title." 29 U.S.C. § 1022(a). The plaintiffs argue both that the notice was not furnished in accordance with § 1024(b)(1) and that it was not written in a manner calculated to be understood by the average plan participant.

Section 1024(b)(1) sets out the requirements for how plan administrators must notify participants of material changes in the Plan. The statute states that "a summary description of such [a material reduction in covered services or benefits] shall be furnished to participants and beneficiaries not later than 60 days after the date of the adoption of the modification or change." 29 U.S.C. § 1024(b)(1). Further, the Secretary of Labor has promulgated regulations interpreting the disclosure requirements of § 1024(b)(1): "[T]he plan administrator shall use measures reasonably calculated to ensure actual receipt of the material by plan participants, beneficiaries and other specified individuals." 29 C.F.R. § 2520.104b-1(b)(1). The regulations indicate that distribution through first-class mail fulfills the disclosure obligation. Id. ("Material distributed through the mail may be sent by first, second, or third-class mail."); Williams v. Plumbers & Steamfitters Local 60 Pension Plan, 48 F.3d 923, 926 (5th Cir. 1995) ("The plan administrator may send the [summary of material modification] by mail."); cf. Degruise v. Sprint Corp., 279 F.3d 333, 336 (5th Cir. 2002) (stating, with respect to a similar provision of COBRA, 29 U.S.C. § 1166, that "[t]his does not mean, however, that employers are required to ensure that plan participants actually receive notice. Rather, it merely obligates employers to use means 'reasonably calculated' to reach plan participants.") (footnote omitted). As a result, we look not at whether Custer actually received the December 2002 notice but instead at the Benefit Committee's method of distribution.[2]

---

[2] The district court's order suggests that the plaintiffs may be able to recover damages by relying merely on prejudice even if Murphy complied with ERISA's reporting and disclosure requirements. See District Court Order of June 1, 2006 ("Having concluded Defendant's notice satisfies ERISA disclosure requirements, Plaintiffs can only recover if they can show active concealment, significant reliance, or prejudice resulting from the lack of notice.") (citing Godwin v. Sun Life Assurance Co., 980 F.2d 323, 328 (5th Cir. 1992)). However, nothing in Godwin suggests that an employer can be held liable for a plaintiff's failure to receive notice

In arguing that it complied with the reporting and disclosure requirements, Murphy asks this court to apply the "mailbox rule." The version of the mailbox rule that Murphy would have us apply "provides that the proper and timely mailing of a document raises a rebuttable presumption that the document has been received by the addressee in the usual time." Schikore v. BankAmerica Supplemental Ret. Plan, 269 F.3d 956, 961 (9th Cir. 2001) (citing Hagner v. United States, 285 U.S. 427, 430 (1932)); see also Beck v. Somerset Techs., Inc., 882 F.2d 993, 996 (5th Cir. 1989) (applying the mailbox rule). Because this mailbox rule functions merely to create a presumption of receipt, it only comes into play when there is a material question as to whether a document was actually received. See, e.g., Schikore, 269 F.3d at 963 ("We note that the Plan requires only actual receipt and does not require any particular form of mailing."). However, in this case, the question is not whether there was actual receipt by the plaintiffs, but rather whether the plan administrator "use[d] measures reasonably calculated to ensure actual receipt." 29 C.F.R. § 2520.104b-1(b)(1). Since the focus here is on only whether notice was mailed, the mailbox rule does not operate in this context.

Although the mailbox rule does not operate here to shift burdens and create presumptions, as Murphy argues, the mailbox rule is still germane to our analysis. A threshold question for the application of the mailbox rule is whether there is sufficient evidence that the letter was actually mailed. Because Murphy contends that the measure the plan administrator used to ensure actual receipt was distribution by first-class mail, we ask whether there is a genuine issue of material fact as to whether Murphy mailed the notice.

---

where the plaintiff has not established that the employer violated ERISA's reporting and disclosure requirements. Rather, for a plaintiff to obtain a remedy under ERISA, the plaintiff must establish, at the very least, that the defendant violated some provision of ERISA.

The summary judgment record provides no physical evidence that the December 2002 notices were mailed, such as business records, a signed receipt from certified mail, or a post-marked envelope. However, Murphy does provide sworn affidavits from Kristi Saulsbury ("Saulsbury"), Murphy's supervisor of mail services, and Alissa Wilson ("Wilson"), a benefits analyst in Murphy's Benefits Department.[3] The two affidavits, read together, state that in distributing the December 2002 notices, Murphy followed its normal mailing procedures and Saulsbury specifically states that "the envelopes were metered for first-class postage and placed in bins for delivery by the United States Postal Service." Both Saulsbury and Wilson supply a copy of the mailing list used to label the December 2002 notices, and the list contains Custer's name and address. "[A] sworn statement is credible evidence of mailing for the purposes of the mailbox rule." Schikore, 269 F.3d at 964; Simpson v. Jefferson Standard Life Ins. Co., 465 F.2d 1320, 1323 (6th Cir. 1972) (same).

Further, we have recognized that "[p]lacing letters in the mail may be proved by circumstantial evidence, including customary mailing practices used in the sender's business." Wells Fargo Business Credit v. Benn Kozloff, Inc., 695 F.2d 940, 944 (5th Cir. 1983). To show that the normal procedures were followed in mailing the December 2002 notice, Murphy provides the deposition testimony of Ronald Smith, the manager of the Benefits Department as well as the affidavits of Saulsbury and Wilson. Saulsbury and Wilson stated that, under the normal process the Benefits Department provides mail services with a list of addresses. Mail services then prints labels of those names and addresses, placing them onto envelopes. The envelopes then go back to the Benefits Department for stuffing and sealing after which they are returned to mail

---

[3] There was a dispute before the district court over whether these affidavits should be stricken from the record; the district court allowed them and the plaintiffs did not renew on appeal their argument to strike these documents from the record.

services. The Saulsbury and Wilson affidavits also corroborate the deposition testimony of Ronald Smith. Soon after the approval of the Plan amendment, Smith stated that his department stuffed the December 2002 notice of material modification into envelopes and the envelopes were delivered to the mail room. As Smith put it, "My department did the stuffing. The mail room did the mailing."

The individuals actually responsible for addressing and mailing the envelopes, Anthony Yarborough and David Kilby, provided no evidence to support that the notices were mailed or how they were addressed. Yarborough and Kilby stated that the mail room does not keep, as a matter of practice, any records, reports, codes, or memoranda concerning what it sends out; the mail room does not know the contents of sealed envelopes received from the Benefits Department; and the computers and printers that would have been used to produce the lists to address the envelopes were discarded in February 2006. Yarborough and Kilby provided no evidence, either physical or testimonial, to support Smith's claim that the notices had been properly addressed and sent.

The plaintiffs, for their part, provide sworn deposition testimony that they never received the notice. Evidence of non-receipt can be used to establish that the notice was never mailed. This is the inverse of the mailbox rule's presumption of receipt. As WIGMORE ON EVIDENCE states:

> The presumption [of receipt] rests upon the supposed uniform efficiency of the postal service in delivering letters duly stamped, addressed, and mailed into its custody; if therefore the efficiency is operating, does not the nonarrival of an alleged letter indicate that such a letter was never given into the postal custody?

9 WIGMORE ON EVIDENCE § 2519 at 567 (Chadbourn rev. 1981); but see, Meckel v. Continental Resources Co., 758 F.2d 811, 817 (2d Cir. 1985) (applying New York law and holding that denial of receipt does not upset finding that a notice was mailed).

In addition to the plaintiffs' claim that they never received the notice, the plaintiffs produce four other employees of the Meraux plant, also shift supervisors like Custer, who could not recall receiving the notice. Three of the four shift supervisors stated they retain benefits documents in records at their homes, and they expected that if they had received the notice it would have been in their records; none was able to find the relevant notice in their personal records. All four stated they regularly discuss changes in the benefits plans, especially those resulting in reductions of coverage for spouses, as here, and none could remember discussing these changes until they learned of Custer's injury and the denial of benefits he expected to receive. Although this is a sort of presumption once-removed when applied to the plaintiffs, it does corroborate the plaintiffs' assertion that Murphy did not mail the notice.

While the plaintiff ultimately bears the burden of demonstrating that Murphy failed to "use measures reasonably calculated to ensure actual receipt" of the notice, Murphy, as the party moving for summary judgment, bears the burden of demonstrating that there is no genuine issue of material fact. See Harvill v. Westward Commc'ns., L.L.C., 433 F.3d 428, 433 (5th Cir. 2005) ("The moving party has the burden of demonstrating that there are no genuine issues of material fact in dispute."). "Where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, or where it is so overwhelming that it mandates judgment in favor of the movant, summary judgment is appropriate." Alton v. Texas A&M Univ., 168 F.3d 196, 199 (5th Cir. 1999).

First, we refuse to fully adopt Wigmore's "inverse mailbox rule" in this setting, such that a plaintiff's bare assertion of non-receipt could create a genuine issue of material fact to survive summary judgment. To do so would essentially require proof of receipt on the employer's part where the regulations only require proof of mailing. But while proof of receipt is unnecessary, we

cannot forget that proof of mailing is still required. On the issue of mailing, it cannot be said that either of Alton's grounds are satisfied, and thus summary judgment is improper.

Turning back briefly to the evidence of mailing in this case, Saulsbury asserts that the notice was mailed. But Murphy has not produced any business records or other physical evidence that the notice was sent. In fact, Murphy has presented no evidence, testimonial or otherwise, as to the day on which the notices were mailed. The only two individuals who make sworn statements that they received the notices are Smith and Wilson, both employees of the Benefits Department responsible for the mailing. The plaintiffs assert that they did not receive the notice. Further, the plaintiffs' assertion of non-receipt is supported by the other Meraux shift supervisors' testimony that they also could not recall receiving the notice, and that they regularly retain such notices but could not locate the notice in their records. [4]

While we refuse to adopt Wigmore's "inverse mailbox rule" in its entirety, in this case, where the employee's assertion of non-receipt is supported by circumstantial evidence, and the employer provides an equally weak assertion that notice was mailed, the issue of mailing should not be decided at summary judgment. 9 WIGMORE ON EVIDENCE § 2519 at 567 (Chadbourn rev. 1981) (self-interested testimony of mailing and self-interested testimony of non-receipt should go to jury); cf. Rosenthal v. Walker, 111 U.S. 185, 193 (1884) (noting that the mailbox rule's presumption of receipt is "a mere inference of fact... and, when it is opposed by evidence that the letters never were received, must be weighed with all the other circumstances of the case, by the jury."). Because

---

[4] Murphy asserts that it produced seven other individuals claiming to have received the notice, but Murphy does no such thing. Instead, Murphy provided the names of seven individuals who Murphy claims to have received the notice.

there is a genuine issue of material fact as to mailing, we reverse the district court's grant of summary judgment on this issue.[5]

2

The plaintiffs also argue that even if Murphy did use proper methods to distribute the notice, Murphy was still not in compliance with § 1022 because the language of the December 2002 notice was not "written in a manner calculated to be understood by the average plan participant." 29 U.S.C. § 1022(a); see also 29 C.F.R. 2520.104b-3(a).

---

[5] Although we reverse the district court's ruling on this issue, we make no holding on the difficult question of what remedy, if any, ERISA provides for a violation of its reporting and disclosure requirements. This issue was neither briefed by the parties nor considered by the district court.

The plaintiffs are seeking the benefits that would have been owed to Custer under the pre-2003 version of the Plan, and they assert that ERISA's civil enforcement provision, § 1132, provides them with this remedy. But the plaintiffs have not attempted to identify which specific subsection of § 1132 provides such a remedy. We have previously considered cases where a plaintiff has sought some remedy))beyond those limited remedies available in § 1132(a)(1)(A))) for technical violations of ERISA's reporting and disclosure requirements. See, e.g., Williams, 48 F.3d at 926; Hines v. Mass. Mut. Life Ins. Co., 43 F.3d 207, 211 (5th Cir. 1995); Godwin, 980 F.2d at 328. But in those cases we did not identify the legal basis for such a remedy, nor did we need to because, in each case, the plaintiffs' claims were dismissed on other grounds. Other circuits which have examined the issue of "substantive remedies" for technical violations of ERISA's reporting and disclosure requirements have come to different conclusions. Compare Watson v. Deaconess Waltham Hosp., 298 F.3d 102, 113 (1st Cir. 2002) (remedy under § 1132(a)(1)(B) available only for "exceptional circumstances"); Panaras v. Liquid Carbonic Indus. Corp., 74 F.3d 786, 789 (7th Cir. 1996) (same) with Lewandowski v. Occidental Chemical Corp., 986 F.2d 1006, 1008 (6th Cir. 1993) (no remedy available under § 1132(a)(1)(B)); Hozier v. Midwest Fasteners, Inc., 908 F.2d 1155, 1170 (3d Cir. 1990) (same); see also Peralta v. Hispanic Bus., Inc., 419 F.3d 1064, 1073 (9th Cir. 2005) (rejecting, for reporting and disclosure violations,§ 1132(a)(1)(B) and (a)(3) as possible sources for benefits sought under a version of a plan in effect prior to the plan's cancellation); Jordan v. Federal Express Corp., 116 F.3d 1005, 1011 (3d Cir. 1997) (suggesting that § 1132(a)(3) gives rise to some "substantive remedies" for reporting and disclosure violations in "extraordinary circumstances") (citing Ackerman v. Warnaco, Inc., 55 F.3d 117, 124 (3d Cir. 1995)).

When relying on a statutory scheme such as ERISA, where Congress has specifically enumerated and limited available remedies, parties are encouraged to identify which remedial provision provides the remedy they seek. See Mass. Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 146 (1985) ("The six carefully integrated civil enforcement provisions found in § 502(a) of the statute as finally enacted, however, provide strong evidence that Congress did not intend to authorize other remedies that it simply forgot to incorporate expressly.") (emphasis in original).

In November 2002, Murphy sent a notice announcing the Plan's open enrollment schedule and stating,

> Medical costs have continued to increase nationwide and unfortunately our Plan has not been immune to this problem. At present we are still reviewing our plan design and associated cost. For the time being coverage and premiums will remain unchanged. However, as soon as our review process has been completed we will advise of any changes in coverage and/or premium.

Following this notice, Murphy sent the December 2002 notice, which is three pages long and contains similar language regarding the increasing costs of medical coverage. But it contains an additional section announcing modifications to the plan effective January 1, 2003. It is this language, announcing the modifications, which the plaintiffs claim is not sufficiently clear. Under a section entitled "<u>MEDICAL PLAN CHANGES</u>," the notice states,

> Disability Termination - When an employee is unable to work due to an illness or injury, medical coverage is continued for a period of time at active employee rates while the employee is on leave of absence. When an employee is unable to return to work due to disability and is terminated due to disability, again our practice has been to continue medical coverage for a period of time at active employee rates. Our employment practice while on leave of absence will remain unchanged, however, should termination occur due to disability, our practice will now be that the employee will be extended COBRA Continuation as required by law. Murphy will subsidize the COBRA premium cost and the employee will only pay the active rate for the initial eighteen months under COBRA. All other terms and conditions under COBRA Continuation provisions will apply.

This section is then followed by another paragraph discussing increasing medical costs and responsible use of benefits.

The notice is clearly announcing changes to the Plan, and the section on disability termination is structured to contrast those benefits previously available to employees terminated due to disability with those benefits available to employees terminated due to disability after January 1, 2003. Taken

together, this language is sufficient to communicate to the average plan participant that beginning January 1, 2003, the Plan's former disability benefits would no longer be available, but rather the Plan would only offer COBRA Continuation coverage. Therefore, we affirm the district court's finding that the content of the December 2002 notice complied with ERISA's disclosure requirements.[6]

B

Next, the plaintiffs argue that Murphy discharged Custer for the purpose of interfering with the plaintiffs' ERISA rights, in violation of 29 U.S.C. § 1140. "To establish a prima facie case of discrimination under ERISA, a plaintiff must establish that his employer fired him in retaliation for exercising an ERISA right or to prevent attainment of benefits to which he would have become entitled under an employee benefit plan." Holtzclaw v. DSC Commc'ns. Corp., 255 F.3d 254, 260 (5th Cir. 2001). "An essential element of a [29 U.S.C. § 1140] is proof of defendant's specific discriminatory intent." Hines v. Mass. Mut. Life Ins. Co., 43 F.3d 207, 209 (5th Cir. 1995).

The plaintiffs attempt to show discriminatory intent by arguing that Murphy terminated Custer two weeks after finding him totally disabled. The plaintiffs argue that the normal company practice was to terminate an employee six months after finding him to be totally disabled. But the evidence the plaintiffs rely on, namely Smith's testimony, does not establish such a policy. Rather, the testimony establishes that Murphy generally waits six months after an employee is on a medical leave of absence before determining whether the employee should be terminated because of disability. Custer was placed on medical leave of absence in December 2003 and terminated in September 2004.

---

[6] Because the plaintiffs did not argue the relevance of the March 2003 SPD before the district court, we do not now consider whether the language of that document was ambiguous, whether that document is the controlling description of the Plan's benefits, or whether the plaintiffs are required to show reliance on the March 2003 SPD.

To the extent that Murphy deviated from its general practice, we cannot find that it was to the detriment of the plaintiffs or that it is evidence of a discriminatory intent.

All evidence suggests that Custer's employment was terminated because he was unable to perform his job function. The plaintiffs do not allege that Custer was able to perform his job function. In Holtzclaw, we held that "qualification for the position sought is an element of a prima facie ERISA claim." Holtzclaw, 255 F.3d. at 261. As a result, we affirm the district court's grant of summary judgment to Murphy on the plaintiffs' retaliation and interference claim.

C

Finally, the plaintiffs argue that the modifications to the Plan are not effective because Murphy never formally approved the modifications. "[O]nly an amendment executed in accordance with the Plan's own procedures and properly noticed could change the Plan." Williams, 48 F.3d at 926. The Plan in effect prior to the modification stated,

> The employer's board of directors, its president or the Plan Administrator may modify or amend the Plan from time to time at its sole discretion. Participants will receive notification of amendments or modifications that affect their coverage.

The Plan Administrator is the Benefit Committee. It is undisputed that the Benefit Committee met on November 11, 2002 and approved the Plan modifications to take effect on January 1, 2003. Murphy has produced the minutes from that meeting indicating such, and the plaintiffs have produced no evidence to the contrary. Once the Benefit Committee approved the changes, it sought corporate approval from Murphy senior management. Although there is no documentary evidence of senior management's approval, such evidence is unnecessary because the terms of the Plan allow the Benefit Committee to

modify the Plan without senior management's approval. Therefore, we affirm the district court's grant of summary judgment on this issue.

### III

In conclusion, we agree with the district court's rulings that the December 2002 notice was sufficiently clear, that Murphy did not discriminate against Custer or interfere in the exercise of his ERISA rights, and that the December 2002 modifications were properly approved in accordance with the Plan. But we REVERSE and REMAND because there is a genuine issue of material fact as to whether Murphy properly distributed the December 2002 notices.