# United States Court of Appeals for the Federal Circuit

2009-1267

CHRYSLER CORPORATION,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

Alan Goggins, Barnes, Richardson & Colburn, of New York, New York, argued for plaintiff-appellant. With him on the brief were Eric W. Lander; and Lawrence M. Friedman, of Chicago, Illinois.

Tara K. Hogan, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With her on the brief were Tony West, Assistant Attorney General, Jeanne E. Davidson, Director, and Todd M. Hughes, Deputy Director.

Appealed from: United States Court of International Trade

Judge Leo M. Gordon

# United States Court of Appeals for the Federal Circuit

2009-1267

CHRYSLER CORPORATION

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

Appeal from the United States Court of International Trade in
Case No. 07-00041, Judge Leo M. Gordon.

_____

DECIDED:  January 19, 2010

_____

Before NEWMAN, LOURIE, and BRYSON, <u>Circuit Judges</u>.

Opinion for the court filed by <u>Circuit Judge</u> LOURIE, in which <u>Circuit Judge</u> BRYSON joins.  Dissenting opinion filed by <u>Circuit Judge</u> NEWMAN.

LOURIE, <u>Circuit Judge</u>.

Chrysler Corporation ("Chrysler") appeals from the summary judgment ruling of the United States Court of International Trade ("the trade court") upholding the denial by United States Customs and Border Protection ("Customs") of a refund on the Harbor Maintenance Tax allegedly paid on exports before July 1, 1990.  <u>Chrysler Corp. v. United States</u>, 601 F. Supp. 2d 1347 (Ct. Int'l Trade 2009).  Because the trade court correctly upheld Customs' refund regulation, 19 C.F.R. § 24.24(e)(4)(iv)(A), with which Chrysler failed to comply, we affirm.

BACKGROUND

I.

In 1986, Congress enacted the Harbor Maintenance Tax ("HMT"), 26 U.S.C. § 4461, requiring exporters, importers, and domestic shippers to pay an ad valorem tax on commercial cargo shipped through the nation's ports. The HMT is collected by Customs and deposited into the Harbor Maintenance Trust Fund ("HMT Trust Fund") from which Congress may make appropriations to pay for harbor maintenance and development projects. 26 U.S.C. § 9505. To implement the HMT, Congress granted Customs broad authority to "prescribe such additional regulations as may be necessary to carry out the purposes of [the HMT]," including, but not limited to, regulations providing for "the manner and method of payment and collection of the tax" and "the settlement or compromise of claims." Id. § 4462(i).

Pursuant to its authority, Customs promulgated regulations governing the collection of HMT payments. See 19 C.F.R. § 24.24 (1987). First Chicago Bank was designated as depositary and financial agent, and in that role entered into the bank's system all original data related to HMT payments, including the remitter's name and address, the type and amount of payments, and the deposit date. The data were then transmitted nightly by electronic interface to Customs' Automated Commercial System database. The bank sent the original paper documents to Customs the following day, but Customs did not initially verify the electronic data.

Customs also issued rules governing refunds of HMT payments. Specifically, Customs provided that operators subject to the HMT could request refunds for overpayments by filing a Harbor Maintenance Fee Amended Quarterly Summary Report

(Customs Form 350) accompanied by supporting documentation. 19 C.F.R. § 24.24(e)(5) (1992). Customs Form 350 lists four specific reasons for requesting a refund, including calculation/clerical errors, duplication of payments, misinterpretation of exemptions, or overvaluation of shipments, and a fifth, catch-all provision.

In 1998, after a decade of enforcement, the Supreme Court affirmed the decision of this court and held the HMT unconstitutional as applied to exports for violating the Export Clause of the U.S. Constitution. United States v. U.S. Shoe Corp., 523 U.S. 360, 363 (1998). To provide refunds of export HMT after U.S. Shoe, Customs then began to compare and reconcile its electronic database with the original paper documentation still in its possession. See U.S. Shoe Corp. v. United States, 22 C.I.T. 880 (1998). In so doing, Customs discovered widespread inaccuracies in its electronic database. Those errors had been introduced into the database in a variety of ways: (1) bank personnel processing HMT payments did not separate payments into different categories (e.g., export versus import) between 1987 and 1994, resulting in class coding errors; (2) operators paying export HMT misidentified payments, consolidated payments for different categories, and/or failed to include supporting documentation with their payments; and (3) freight forwarders paid for multiple operators without identifying the individual exporters. Customs thus had to make thousands of corrections to its database. Altogether Customs corrected over $140 million worth of non-export payments incorrectly listed as export HMT payments and over $25 million in export payments incorrectly listed as non-export HMT.

Two years later, this court expanded the pool of refund claimants by holding that Customs' denial of a refund request for export HMT is a "protestable decision,"

actionable under 28 U.S.C. § 1581(a), and thus not subject to the two-year statute of limitations of § 1581(i) applicable in U.S. Shoe. Swisher Int'l, Inc. v. United States, 205 F.3d 1358, 1369 (Fed. Cir. 2000). To streamline the refund process after Swisher, Customs amended its refund regulation to eliminate the requirement that a claimant submit supporting payment documentation for a refund of certain export payments. 19 C.F.R. § 24.24(e)(4)(iv)(A); Amended Procedure for Refunds of Harbor Maintenance Fees Paid on Exports of Merchandise, 67 Fed. Reg. 31,948 (final rule May 13, 2002); 66 Fed. Reg. 16,854 (interim rule Mar. 28, 2001). Specifically, Customs eliminated the supporting documentation requirement for export payments made on or after July 1, 1990, because Customs still possessed copies of the original payment documents with which to verify the refund amounts contained in its electronic database. 67 Fed. Reg. at 31,949; 66 Fed. Reg. at 16,855. For payments made before July 1, 1990, however, Customs retained the documentation requirement because it no longer possessed the original documents and concluded that, because of the widespread inaccuracies in its electronic database, it could not rely on the database as the sole source of payment information. 67 Fed. Reg. at 31,949-50.

Also, to assist exporters in identifying payments, Customs agreed to search both its electronic and paper records and to provide that information to the requester. Thus, an exporter seeking a refund would receive from Customs (1) an HMT Payment Report listing all of that exporter's payments reflected in Customs' electronic database and paper documents and (2) an HMT Refund Report and Certification ("Report/Certification" or "Refund Report") listing all of the payments supported by paper documentation (and thus eligible for a refund). 19 C.F.R. § 24.24(e)(4)(iv)(B)(2). If

dissatisfied, the exporter could, within 120 days, file a request for a revised HMT Report/Certification along with documentation to support any payments either not listed on the Report/Certification or incorrectly recorded. Id. § 24.24(e)(4)(iv)(B)(3). The exporter could then file a protest for any payments not approved for a refund in a Revised Report/Certification after expiration of the 120-day period. Id. § 24.24(e)(4)(iv)(B)(4). To assist exporters in verifying export payments made before July 1, 1990, Customs expanded the types of documents that an exporter could submit to support a refund. Id. § 24.24(e)(4)(iv)(A),(C). Based on its revised procedures, Customs has refunded over $77 million worth of pre-July 1, 1990, export HMT payments.

## II.

On February 9, 2001, Chrysler filed an administrative claim with Customs for a refund of its export HMT payments. On October 15, 2002, Customs sent Chrysler an HMT Payment Report and a Report/Certification pursuant to 19 C.F.R. § 24.24(e)(4)(iv)(B)(2). The HMT Payment Report shows that between September 1987 and February 1998 Chrysler paid a total of $14,331,425.67 in unconstitutional export taxes. The Receipt/Certification, however, excluded $782,407.45 in pre-July 1, 1990, payments for which Chrysler had failed to provide supporting documentation, leaving Chrysler with an undisputed refund of $13,549,018.22. On February 10, 2003, Chrysler requested the disputed $782,407.45 in pre-July 1, 1990, monies but failed to submit any supporting documents as required by Customs' refund regulation, 19 C.F.R. § 24.24(e)(4)(iv)(A). Customs denied the request two days later. On March 5, 2003, Chrysler filed a protest, which Customs denied on January 29, 2007, because Chrysler

again had failed to submit any supporting documents. On February 12, 2007, Chrysler filed a complaint in the trade court.

On January 29, 2009, the trade court upheld on summary judgment the denial of Chrysler's export HMT refund request, concluding that Chrysler had failed to invalidate Customs' regulation requiring documentation for pre-July 1, 1990, export payments. Chrysler, 601 F. Supp. 2d at 1349. The court first found that because Congress had expressly delegated rulemaking authority to Customs and Customs had used the relatively formal administrative procedure of notice and comment rulemaking in promulgating its regulation, the court would apply Chevron deference to the regulation. Id. at 1351 (citing Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984)). Then, after noting that the HMT statute does not provide a specific method for refunding HMT collections, id., the trade court afforded the regulation controlling weight as a reasonable gap-filling method to accomplish the HMT's statutory purpose, id. at 1353. Specifically, the court held that requiring verification for pre-July 1, 1990, export payments rather than relying solely on a database that the agency had determined to be unreliable reasonably fulfilled Customs' obligation to refund export HMT under U.S. Shoe while also protecting constitutional payments commingled in the HMT Trust Fund. Id.

In so holding, the trade court rejected Chrysler's argument that the regulation is contrary to law because it conflicts with a presumption of correctness that attaches to the HMT database as an official record. The court found that because Customs had expressly rejected sole reliance on its electronic database when amending its regulations, the presumption no longer applied to the database but rather to the factual

components of Customs' protest decision, which included the legislative fact of an unreliable HMT database. Id. As such, the trade court concluded, Chrysler had the burden of showing that its requested refund of $782,407.45 was accurate and export-related, and, by relying solely on its theory of the presumption of correctness, had failed to raise a genuine factual issue regarding either the unreasonableness of Customs' refund regulation or Chrysler's compliance with the regulation. Id. at 1355.

Chrysler timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

## DISCUSSION

We review a grant of summary judgment by the trade court "for correctness as a matter of law, deciding de novo the proper interpretation of the governing statute and regulations as well as whether genuine issues of material fact exist." BMW Mfg. Corp. v. United States, 241 F.3d 1357, 1360 (Fed. Cir. 2001).

## I.

Chrysler argues that the trade court erred in giving deference to Customs' refund regulation because Customs promulgated the regulation after the Supreme Court had held the authorizing statute unconstitutional in U.S. Shoe. Rather, according to Chrysler, Customs amended 19 C.F.R. § 24.24 to implement U.S. Shoe and Swisher, which held that Customs must refund all export HMT payments, and thus the regulation is subject to de novo review and must be struck down because it bars Chrysler's refund. Chrysler also asserts that the regulation is invalid for perpetuating a violation of the Export Clause by placing the burden of resubmitting payment documents on Chrysler. Lastly, Chrysler argues that the trade court erred by failing to apply a presumption of

correctness to Customs' electronic database and thus failing to require Customs as the party challenging the accuracy of its records to overcome that burden with evidence that Chrysler's disputed HMT export payments were incorrectly recorded.

The government responds that the Supreme Court held the HMT unconstitutional only as applied to exports, and thus Customs retained its statutory grant of broad rulemaking authority to collect and protect other legal categories of HMT. Furthermore, the government asserts that the regulation does not violate the Export Clause by imposing routine administrative procedures for substantiating refund claims, and that imposing such procedures does not conflict with any judicial decision, but rather was expressly approved by this court and the trade court's decisions in Swisher. Finally, the government argues that the presumption of correctness does not limit Customs' rulemaking authority, but rather, based on the posture of this case, it is Customs' protest decision that enjoys the presumption, placing the burden on Chrysler to show that Customs erred in denying Chrysler's protest.

We agree with the government and affirm the trade court's decision upholding Customs' refund regulation. Despite Chrysler's insistence that the Supreme Court held the export HMT statute unconstitutional, and that with no valid statute there can be no rulemaking authority and thus no deference, Chrysler ignores that this court has upheld the HMT statute as applied to other port uses. See Carnival Cruise Lines, Inc. v. United States, 200 F.3d 1361, 1366-69 (Fed. Cir. 2000) (upholding the application of the HMT to cruise ship passengers). Thus, Customs retained its broad authority under the statute to collect and administer the HMT, and we have afforded its regulations deference. See BMW, 241 F.3d at 1363; Princess Cruises, Inc. v. United States, 201

F.3d 1352, 1357 n.7, 1359-62 (Fed. Cir. 2000). Customs also retained the authority to refund unconstitutional HMT payments, see Swisher, 205 F.3d 1358, which Chrysler, having already received a refund of over $13 million pursuant to Customs' regulations, does not dispute. And we expressly recognized in Swisher Customs' continued authority to prescribe regulations in administering refunds, noting in the context of export refunds that "Customs was free to impose time limits on the filing of HMT refund requests . . . and it remains free to alter the regulation to impose a time limit [for seeking HMT refunds] in the future." Id. at 1368.

Recognizing Customs' rulemaking authority in this case has even more force. The HMT Trust Fund contains unconstitutional export payments commingled with constitutional non-export payments. Thus, refunding the export payments implicates not only Customs' authority to administer export refunds but also its authority to administer the constitutional HMT payments, which necessarily includes protecting those payments from being erroneously refunded. See 19 U.S.C. § 1484(a)(2)(C). As such, we easily conclude that Customs retains the authority under the HMT statute to amend and enforce its refund regulation as applied to export HMT.

We turn next to the question whether Customs' regulation is entitled to deference. Here the trade court correctly found, and Chrysler does not dispute, that the statute is silent on the specific method for refunding HMT payments. Chrysler, 601 F. Supp. 2d at 1351; see Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 92 (2002). Rather, Congress expressly delegated broad authority to Customs to prescribe all regulations necessary to carry out the purposes of the HMT, including, but not limited to, the collection of payments and the settlement of claims. 26 U.S.C. § 4462(i). As

such, we afford Customs' regulations directed to administering the HMT payments controlling weight if they are "reasonably related to the purposes of the enabling legislation." Mourning v. Family Publ'n Servs., 411 U.S. 356, 369 (1973) (quoting Thorpe v. Housing Auth. of City of Durham, 393 U.S. 268, 280-81 (1969)). "A regulation cannot stand if it is 'arbitrary, capricious, or manifestly contrary to the statute.'" Ragsdale, 535 U.S. at 86 (quoting Chevron, 467 U.S. at 844).

Congress enacted the HMT statute to generate revenue for the maintenance and development of the nation's ports. See 26 U.S.C. §§ 4461-4462, 9505. Pursuant to that purpose, Customs has required claimants to submit supporting documentation to receive any refund from the revenues collected and maintained in the HMT Trust Fund. 19 C.F.R. § 24.24(e)(5) (1992). Yet, faced with a flood of refund requests following this court's decision in Swisher, Customs amended its regulations to decrease the burdens on exporters seeking refunds. 19 C.F.R. § 24.24(e)(4)(iv)(A),(C). Customs eliminated the requirement for claimants to submit supporting documentation for post-July 1, 1990, export payments based on its ability to verify those payments with the original payment documents within its possession. Id. § 24.24(e)(4)(iv)(A). Customs retained the then-existing requirement for supporting documentation for pre-July 1, 1990, export payments, however, because it had found that its electronic database contained widespread errors. Unquestioningly refunding payments based solely on the database, as Chrysler requests, would have resulted in over $140 million in erroneously refunded monies, thus depleting constitutional revenues generated under the HMT statute. Customs expressly considered and rejected such a suggestion when amending its regulations. 67 Fed. Reg. at 31,950. Yet Customs also recognized the burden some

exporters would face in locating the requested documents.  Id.  Customs therefore amended its regulations to help exporters (1) identify payments by providing them with all of the data in its records and (2) verify those payments by expanding the types of documentation that would support a refund of pre-July 1, 1990, export HMT payments. 19 C.F.R. § 24.24(e)(4)(iv)(B),(C).

Faced with the intertwined obligations to refund export HMT and to protect the commingled constitutional HMT revenue, we have no trouble concluding that Customs' regulation provides a reasonable compromise.  As such, the trade court correctly gave the regulation controlling weight.  Chrysler, 601 F. Supp. 2d at 1353.  And because Chrysler readily admits that it did not comply with Customs' refund regulation, we affirm the denial of Chrysler's protest.

In upholding Customs' regulation, we reject Chrysler's meritless arguments that the regulation is subject to de novo review because it conflicts with decisions of the Supreme Court, this court, and the trade court, and because it perpetuates a constitutional violation.  Regarding the latter, a regulation does not violate the Export Clause by requiring a claimant to follow certain administrative procedures to receive a refund.  United States v. Clintwood Elkhorn Mining Co., 128 S. Ct. 1511, 1517-19 (2008).  Regarding the former, neither the Supreme Court in U.S. Shoe nor this court or the trade court in Swisher ordered the refund of all export taxes without regard for administrative checks to ensure the refund of only export payments.  In fact, our decision in Swisher confirmed that exporters could seek a refund by complying with (rather than evading) Customs' administrative refund procedures and noted Customs' authority to amend the regulations to set a time limit on such refund requests.  205 F.3d

at 1367-69. Similarly, the trade court's Swisher decision expressly recognized Customs' authority to require documentation to support additional refunds for payments not listed on its Refund Report. Swisher Int'l, Inc. v. United States, 25 C.I.T. 183, 185 (2001).

Lastly, Chrysler misapprehends the presumption of correctness in its attempt to evade Customs' regulation. The presumption is a procedural device that allocates the burden of producing evidence between two litigants; it is distinct from and does not undermine the deference given an agency's regulation. Universal Elecs. Inc. v. United States, 112 F.3d 488, 492-93 (Fed. Cir. 1997); Goodman Mfg., L.P. v. United States, 69 F.3d 505, 508 (Fed. Cir. 1995). Here it is Customs' protest decision that enjoys a presumption of correctness, 28 U.S.C. § 2639(a)(1), placing the burden on Chrysler to show that there was insufficient evidence for the factual components of that decision. Universal Elecs., 112 F.3d at 492-93. But Chrysler does not dispute the factual components; Chrysler admits that it failed to provide supporting documentation with its refund request for pre-July 1, 1990, export payments as required by 19 C.F.R. § 24.24(e)(4)(iv)(A). Rather, Chrysler incorrectly seeks to use the presumption of correctness to undermine the legal standard governing the deference this court affords Customs' regulations. Id.; see also Goodman, 69 F.3d at 508. But to invalidate the regulation, Chrysler had to show that Customs' rulemaking decision not to rely solely on its electronic database was not reasonably related to the HMT's statutory purpose or was arbitrary, capricious, or manifestly contrary to law. See Ragsdale, 535 U.S. at 86. Chrysler would perhaps have been correct and the presumption would have applied against Customs if there had been no regulation requiring supporting documentation or

if Chrysler had introduced into evidence official documents indicating that the company had in fact submitted documentation to support its refund request.  See, e.g., VWP of Am., Inc. v. United States, 175 F.3d 1327, 1341-42 (Fed. Cir. 1999).  But by relying solely on a presumption of correctness attaching to Customs' database in the face of Customs' regulation, Chrysler has failed to raise a genuine issue of fact regarding the validity of the regulation or its compliance with that regulation.

## II.

Finally, in a last-ditch effort, Chrysler argues that the trade court committed reversible error by not drawing the strongest adverse inference against Customs for destroying HMT-related documents in the regular course of business before and during litigation over the HMT's constitutionality.  Specifically, Chrysler contends that the National Archives and Records Administration ("NARA") procedures required Customs to halt the destruction of such documents as early as the HMT's enactment, because a House Report had called into question the constitutionality of the export HMT, H.R. Rep. No. 99-251, pt. 4, at 24 (1985), but at least by October 1993 when the first case challenging the HMT, Carnival Cruise Lines, Inc. v. United States, 8 F. Supp. 2d 877, 878 (Ct. Int'l Trade 1998), rev'd, 200 F.3d 1361 (Fed. Cir. 2000), was filed.

The government responds that Chrysler never sought an adverse inference based on spoliation of documents below, and thus the trial court did not abuse its discretion in not imposing such an inference.  But regardless, the government asserts, Chrysler's argument fails because Chrysler itself created, possessed, and then destroyed the very same records that it now says Customs should have retained.

Again we agree with the government. As with the presumption of correctness, Chrysler is misapplying the law of spoliation. The culpable destruction of relevant documents does not relax the burden of proof, although it may aid a party in meeting that burden by giving rise to an inference that the information contained in the destroyed documents would have been unfavorable to the party responsible for their destruction. See Jandreau v. Nicholson, 492 F.3d 1372, 1375 (Fed. Cir. 2007). What Chrysler seeks here, however, is not an evidentiary ruling on the destroyed documents but rather an unavailable adverse inference against the deference given Customs' refund regulation. See Eaton Corp. v. Appliance Valves Corp., 790 F.2d 874, 878 (Fed. Cir. 1986).

Moreover, there is no dispute that Customs destroyed the relevant documents here in the ordinary course of business before the trade court ordered Customs to retain all HMT-related documents in 1998, U.S. Shoe, 22 C.I.T. at 881, and before Chrysler filed its refund claim in 2001. As such, the documents Chrysler seeks were not "affected by a court order" under the NARA until 1998 and not "subject to litigation proceedings" under the NARA until 2001 at the earliest. J.A. 280. The trade court, therefore, clearly acted within its discretion in declining to impose an adverse inference.

Chrysler also cannot claim any unfairness, as Chrysler created and then destroyed the very same documents it now blames Customs for destroying. Chrysler, no less than Customs, should have been on notice that the constitutionality of the HMT had been questioned and thus on notice that its HMT documents could be the subject of litigation. Moreover, by 1991 Chrysler was on notice that its HMT documents were required for any future refund request, 56 Fed. Reg. 21,445 (May 9, 1991); 19 C.F.R.

§ 24.24(e)(5) (1992), a time at which Chrysler should still have possessed all of the HMT-related documents it had generated since the HMT's inception, 19 C.F.R. § 24.24(e)(g) (1987) (requiring operators subject to the HMT to maintain records for five years). That Customs eliminated the documentation requirement for post-July 1, 1990, export payments, and thus facilitated Chrysler's collection of over $13 million in unconstitutional HMT, does not require Customs to unquestioningly hand over $782,407.45 in pre-July 1, 1990, payments that Chrysler cannot verify it paid on exports.

## CONCLUSION

For the foregoing reasons, we affirm the Court of International Trade's summary judgment decision upholding the denial by Customs of Chrysler's HMT export refund request based on Chrysler's failure to comply with 19 C.F.R. § 24.24(e)(4)(iv)(A).

## AFFIRMED

# United States Court of Appeals for the Federal Circuit

2009-1267

CHRYSLER CORPORATION,

Plaintiff-Appellant,

v.

UNITED STATES

Defendant-Appellee.

Appeal from the United States Court of International Trade in Case No. 07-00041, Judge Leo M. Gordon.

NEWMAN, <u>Circuit Judge</u>, dissenting.

Let us be clear as to the issue on this appeal. The tax refund claimed by Chrysler is the amount that Customs' tax records show was paid by Chrysler as export tax. This is not a case of a taxpayer claiming a refund it cannot substantiate. Customs' regular business records show that Chrysler paid export taxes totaling $782,407.45 for exports before July 1, 1990. Each separate payment and amount during this period is shown on the Customs record, and is covered by the refund order for the unconstitutional tax. These are the tax payments that Customs now refuses to refund, on the ground that the Customs database may contain errors. These are the refusals of refund that my colleagues sustain, although no errors have been shown or suggested in any Chrysler record.

Customs destroyed the original tax payment documents for the period before July 1, 1990. Thus Customs takes the position that because it can no longer double-check the correctness of its business records for the period before July 1, 1990, it need make no refund of any tax payments shown on its records as received from Chrysler for export tax, unless Chrysler independently proves, by copies of the original documentation sent to Customs, that the tax was paid as the Customs records say it was paid.

Chrysler, like Customs, has not retained its original tax documents for the pre-1990 years. However, the Customs permanent records show each payment received from Chrysler, identify the purpose of each payment, state whether it was for the tax on exports or another purpose for which Customs collects taxes, such as for imports and entry into free trade zones. All of the payments were entered, in accordance with Customs' standard procedure, on its Automated Commercial System database. Customs does not dispute that its records show the actual payment of taxes in these amounts by Chrysler, and does not state that any error was ever found in any recorded amount received from Chrysler, upon checking Customs' records for the periods for which Customs had not destroyed the original documents.

The Customs electronic records were prepared from the original tax documents at the time those taxes were paid, in the ordinary course of business. As my colleagues on this panel explain, Customs processed its collections through the First Chicago Bank, which recorded on a daily basis all Harbor Maintenance Tax payments, including the remitter's name and address, the type and amount of payment, and the deposit date. These data were transmitted nightly to the Automated Commercial System database of the Customs Service, and the next day the bank would send Customs the original documents for the

previous day's entries in the database. The Chrysler payments here at issue were processed in accordance with this procedure. The database shows each tax payment received from Chrysler, its date, amount, and purpose.

Customs does not state that any error was ever found in any record of any payment by Chrysler, including payments for periods for which Customs still has the original documents. Customs does not argue that anything about Chrysler's records shows susceptibility to the kinds of errors that Customs has identified for some other payors, such as a failure to record whether the payment was for exports or some other purpose, or failure to separate its payments as to separate exporters. Customs does not state that it has any reason to believe the records in its database pertaining to Chrysler contain errors, or record taxes that were not paid.

My colleagues nonetheless attribute a "failure of documentation" to Chrysler, and hold that Chrysler cannot recover its payments for the pre-1990 period. I emphasize that this is not a case in which Chrysler is claiming a refund for which the amount or entitlement is in dispute. At issue are taxes that the government's official record shows were paid and received. The presumption of correctness of official records applies to the government as well as the governed. See VWP of Am., Inc. v. United States, 175 F.3d 1327, 1342 (Fed. Cir. 1999) (government records are taken as definitive unless the government can produce some evidence that they are incorrect). Whatever errors may exist in Customs' records, there is no suggestion that the payments that the official record states were made by Chrysler were erroneously entered.

If the government seeks to invoke its own record-keeping error as the ground for refusing Chrysler's refund, it must provide some reasonable basis for doing so. Customs

does not argue that an erroneous recordation methodology universally infected all of its processing of export tax receipts.  We are offered no rational basis for Customs' refusal to refund any of the export tax that its own records show was paid by Chrysler.  Although the court ratifies Customs' action on a theory of regulatory "deference," impropriety does not warrant deference.

This seriously improper result requires judicial attention, for by refusing to credit any of its own official records made before July 1, 1990, the government retains for itself the entirety of the tax that was improperly collected from Chrysler.  From my colleagues' contrary ruling, I respectfully dissent.