# United States Court of Appeals for the Federal Circuit

---

**FORD MOTOR COMPANY,**
*Plaintiff-Appellant,*

**v.**

**UNITED STATES,**
*Defendant-Appellee.*

---

2011-1224

---

Appeal from the United States Court of International Trade in case no. 06-CV-0217, Judge Leo M. Gordon.

---

Decided: April 16, 2012

---

GREGORY G. GARRE, Latham & Watkins, LLP, of Washington, DC, argued for the plaintiff-appellant. On the brief were BRUCE J. CASINO, HOWARD R. RUBIN, ROBERT T. SMITH and JENNIFER T. KARLIN, Katten Muchin Rosenman LLP, of Washington, DC. Of counsel was PAULSEN KING VANDEVERT, Ford Motor Company, of Dearborn, Michigan.

TARA K. HOGAN, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With her on the brief were TONY WEST, Assis-

tant Attorney General, JEANNE E. DAVIDSON, Director, and TODD M. HUGHES, Deputy Director.

———————————

Before LINN, DYK, and O'MALLEY, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* DYK. Dissenting opinion filed by *Circuit Judge* O'MALLEY.

DYK, *Circuit Judge*.

Ford Motor Company ("Ford") appeals a judgment of the U.S. Court of International Trade ("Trade Court"). The Trade Court granted partial summary judgment in favor of the United States with respect to Ford's claims for refunds of the Harbor Maintenance Tax allegedly paid on exports before July 1, 1990. *Ford Motor Co. v. United States* ("*Pre-July 1, 1990, Decision*"), No. 06-00217, slip op. at 7 (Ct. Int'l Trade Jan. 27, 2010). The Trade Court also separately granted summary judgment in favor of the United States with respect to post-July 1, 1990, Harbor Maintenance Tax refund claims. *Ford Motor Co. v. United States* ("*Post-July 1, 1990, Decision*"), 744 F. Supp. 2d 1367, 1370 (Ct. Int'l Trade 2010). In both respects, the Trade Court found that Ford did not submit the proof of payment of export taxes required by applicable regulations. We affirm.

BACKGROUND

In 1998, the Supreme Court held that the Harbor Maintenance Tax ("HMT"), 26 U.S.C. §§ 4461-4462, was unconstitutional as applied to exports because it violated the Export Clause of the Constitution. *United States v. U.S. Shoe Corp.*, 523 U.S. 360, 363 (1998). This case concerns the regulations adopted by U.S. Customs and Border Protection ("Customs") governing the procedures for refund claims for such export taxes. The history of the

HMT and the rules adopted by Customs for the payment and refund of the HMT is set forth more fully in this court's opinion in *Chrysler Corp. v. United States*, 592 F.3d 1330 (Fed. Cir. 2010). For purposes of this case, the following history is a brief summary.

In 1986, Congress enacted the HMT, which required all shippers to pay an ad valorem tax on commercial cargo shipped through the nation's ports. Water Resources Development Act of 1986, Pub. L. No. 99-662, Title XIV, § 1402(a), 100 Stat. 4082, 4266-69. The HMT was imposed on exports, imports, and domestic shipments.[1] To receive payment of the HMT, Customs set up lock boxes at First Chicago Bank for each type of HMT payment. Separate lock boxes were established for exports, imports, and domestic shipments. HMT payors were instructed to send their payments, along with the necessary documentation, to the appropriate lock box. On receipt, the bank processed the payments and entered into its system the information related to each payment, such as the remitter's name and address, the type and amount of payment, and the deposit date. Each night, the information in the bank's system was transmitted by electronic interface to Customs's Automated Commercial System ("ACS") database. The bank shipped the original paper documentation to Customs the following day, but Customs did not initially review the paper documentation or verify the electronic data.

In 1998, the Supreme Court held the tax unconstitutional only as it applied to exports. After that decision, Customs developed an administrative refund process for

---

[1] The HMT was also imposed on certain other transactions such as foreign trade zone admissions and arriving passengers aboard commercial vessels. For simplicity we ignore these.

HMT paid on exports.  As part of this process, Customs contracted with a third party to create a stand-alone HMT database to assist in processing HMT refund claims for export taxes.  The stand-alone HMT database contained HMT payment and refund data downloaded directly from the ACS database.  Because only the HMT on exports was held unconstitutional, it was necessary to differentiate between different types of HMT payments in processing refunds.

While processing refunds, Customs discovered widespread inaccuracies in its HMT database as compared to the paper documentation received from the bank.  These errors were introduced by both payors and bank personnel.  Some payors submitted HMT filings that were not carefully prepared and were either unclear, illegible, or did not contain enough detail to allow the correct processing by the bank.  Other payors would, for example, make payments for different types of HMT without separating export HMT payments from the other types and sending each to the appropriate lock box.  Because bank personnel did not separate out payments into different categories when processing the payments, these consolidated payments would be incorrectly entered into the system as consisting of a single type of HMT payment.  Even where not consolidating payment types, payors would sometimes send payments to the wrong lock box, which would cause the bank personnel to process the payment as though it were of a different type, such as, for example, processing a payment as an export HMT payment when in fact it might have been an import HMT payment which was not refundable.  In other instances, bank personnel would simply incorrectly key in the information from the paper documentation received.  A comparison with the paper documentation would reveal most of these errors.  Customs made thousands of corrections to its database but

was not able to make corrections related to payments made before July 1, 1990, because it no longer possessed the original paper documentation.

In light of the lack of paper documentation for claims filed before July 1, 1990, Customs established different requirements depending on whether an exporter was seeking a refund of pre- or post-July 1, 1990, payments. For pre-July 1, 1990, payments, the regulations provided that an exporter could not rely on the database alone but was required to submit "supporting documentation"—i.e., paper documentary proof "establishing entitlement to a refund." 19 C.F.R. § 24.24(e)(4)(iv)(C). For post-July 1, 1990, payments, Customs issued a "Harbor Maintenance Tax Payment Report and Certification" listing all export tax payments reflected in its corrected database (corrected based on the paper documentation). If an exporter concluded that the report failed to include a payment or listed an incorrect amount, the exporter could dispute the report again by submitting "supporting documentation" to establish entitlement to a refund. *Id.* The same regulation (19 C.F.R. § 24.24(e)(4)(iv)(C)) defined "supporting documentation" for both pre-July 1, 1990, claims and post-July 1, 1990, claims.[2]

---

[2]    The relevant regulation provides in full:

The supporting documentation that CBP [Customs and Border Patrol] will accept as establishing entitlement to a refund, whether submitted with a refund request or a request for a Revised Report/Certification, is whichever of the following documents CBP accepted with the payment at the time it was made: a copy of the Export Vessel Movement Summary Sheet; where an Automated Summary Monthly Shipper's Export Declaration was filed, a copy of a letter containing the exporter's identification, its employer identification

Ford filed HMT refund claims with Customs in April 2003 for both pre- and post-July 1, 1990, payments. To date, Ford has received export HMT refund payments totaling more than $17 million from Customs. At issue here are approximately $2.5 million in HMT refund payments that Ford alleges it is still owed. With respect to its pre-July 1, 1990, claims, Ford submitted a 1998 Freedom of Information Act ("FOIA") Report, which had been provided by Customs to Ford at Ford's request, summarizing and listing each quarterly HMT payment made between 1987 and 1992. With respect to the pre-July 1, 1990, period, the FOIA Report had been drawn entirely from the information in Customs' ACS database. In addition, Ford submitted an affidavit attesting to the fact that it was only claiming refunds of HMT paid on export shipments and two declarations from Ford employees attesting to the consistency and quality of Ford's quarterly HMT payment records. With respect to its post-July 1, 1990, claims, Ford submitted copies of 20 Export

---

number (EIN), the Census Bureau reporting symbol, and, the quarter for which the payment was made; or a copy of a Harbor Maintenance Fee Quarterly Summary Report, CBP Form 349, for the quarter covering the refund requested. CBP also will consider other documentation offered as proof of payment of the fee, such as cancelled checks and/or affidavits from exporters attesting to the fact that all quarterly harbor maintenance tax payments made by the exporter were made exclusively for exports, and will accept that other documentation as establishing entitlement for a refund only if it clearly proves the payments were made for export harbor maintenance fees in the amounts sought to be refunded and were made by the party requesting the refund or the party on whose behalf the refund was requested.

19 C.F.R. § 24.24(e)(4)(iv)(C).

Vessel Movement Summary Sheets ("EVMSSs")[3] from Ford's own files which allegedly demonstrated Ford's HMT payments on export shipments for which Customs had no record.

Customs denied Ford's claims and its subsequent protest because Ford submitted insufficient supporting documentation. Ford then filed suit in the Trade Court, alleging that the supporting documentation it had filed entitled it to a refund of $2,652,257.84. Following discovery, both parties filed cross-motions for summary judgment with respect to Ford's claims for pre-July 1, 1990, HMT. The Trade Court entered judgment in favor of the United States for these claims, reasoning that the FOIA Report, because it was derived from a flawed and unreliable database, did not provide proof as required under the refund regulations. *Pre-July 1, 1990, Decision*, slip op. at 4-5. Neither the affidavit nor the declarations verified Ford's payments of export-related HMT. *Id.* at 5.

The parties later filed cross-motions for summary judgment with respect to Ford's claims for post-July 1, 1990, HMT. The Trade Court again ruled in favor of the United States, finding that the record was devoid of "any evidentiary proffer from Ford that the Export Vessel Summary Sheets were 'accepted' by Customs at the time of Ford's alleged HMT payments." *Post-July 1, 1990, Decision*, 744 F. Supp. 2d at 1370. Indeed, "[t]he record lacks evidence that Ford's Export Vessel Summary Sheets were ever mailed, transmitted, or delivered to, and ultimately accepted by, Customs at the time of Ford's alleged HMT payments." *Id.* Having found in favor of the United States on all disputed refund claims, the Trade Court

---

[3] An EVMSS was a document filed with Customs that certified a company's exports subject to the HMT on exports for a particular quarter. *See, e.g.*, J.A. 421.

entered final judgment. Ford timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

## DISCUSSION

We review the Trade Court's rulings on summary judgment "for correctness as a matter of law, deciding *de novo* the proper interpretation of the governing statute and regulations as well as whether genuine issues of material fact exist." *BMW Mfg. Corp. v. United States*, 241 F.3d 1357, 1360 (Fed. Cir. 2001).

## I

Ford argues that it "establish[ed] entitlement to a refund" under 19 C.F.R. § 24.24(e)(4)(iv)(C) with respect to its pre-July 1, 1990, claims by submitting the 1998 FOIA Report as well as two declarations and an affidavit establishing the regularity and level of detail in the HMT export documentation submitted by Ford to the bank for transmittal to Customs. Ford relies on the portion of the regulation providing that Customs would accept

> other documentation offered as proof of payment of the fee, such as cancelled checks and/or affidavits from exporters attesting to the fact that all quarterly harbor maintenance tax payments made by the exporter were made exclusively for exports.

19 C.F.R. § 24.24(e)(4)(iv)(C). However, the documents offered by Ford, without more, do not "clearly prove[] the payments were made for export harbor maintenance fees in the amounts sought to be refunded" as required by the regulations, *id.*, and thus are insufficient to constitute supporting documentation establishing entitlement to a refund.

In *Chrysler*, we upheld Customs's rulemaking decision barring exporters from relying solely on its electronic

database to prove entitlement to a refund. 592 F.3d at 1337. Customs had explained that its "experience with older payments recorded in the database has shown that *the database is unreliable. Customs therefore cannot rely exclusively* on that record source to confirm export fee payments . . . ." Amended Procedure for Refunds of Harbor Maintenance Fees Paid on Exports of Merchandise, 67 Fed. Reg. 31,948, 31,950 (May 13, 2002) (emphasis added).

Here, Ford is attempting to demonstrate its entitlement to a refund through a FOIA Report which was drawn from the same unreliable information. Ford contends that the FOIA Report is reliable because it was based on "information and data in Customs' ACS mainframe computer system," not the "unique, stand-alone and allegedly flawed HMT database" in *Chrylser*. Appellant's Br. 27. This is not the case. The ACS database from which the FOIA Report was drawn as to the pre-July 1, 1990, claims contained the same errors found in the stand-alone HMT database. The record in this case is clear that "[t]he standalone HMT database was created by an electronic download of data [in a] file contained in the ACS [database]." J.A. 552; *see also* J.A. 324 ("Initial input of data into the [HMT] database came from downloaded data from Customs' Harbor Maintenance Fee Module (HMT collection data) and Refund Module, which contained HMT refund data."). Ford did not point to any evidence that errors were introduced into the HMT database when downloaded from the ACS database.[4] Thus, any errors in the admittedly flawed HMT database were also necessarily present in the ACS database from which

---

[4] The fact that the ACS database might contain additional data as compared to the HMT database does not indicate that it was any more reliable with respect to the refund data that was imported into the HMT database.

the FOIA Report was drawn, and Customs properly rejected the FOIA Report as supporting documentation.[5]

Ford also submitted two declarations demonstrating, inter alia, the care and precision with which Ford prepared the paper HMT export documentation submitted to the bank for transmittal to Customs. It is Ford's position that these documents demonstrate that Ford's refund claims did not contain the kinds of errors commonly found in the HMT database with respect to other pre-July 1, 1990, refund claims, and thus the FOIA Report should establish Ford's entitlement to export refunds. These documents, however, do not demonstrate that the HMT database was accurate with respect to Ford's payments.

As described above, errors in the electronic database were caused by both bank personnel error in processing and recording HMT payments and exporter error in submitting unclear or incomplete information, misidentifying or consolidating different types of payments, and sending payments to the wrong lock box. *See Chrysler*, 592 F.3d at 1332. Ford's declarations demonstrate only that its HMT submissions were carefully prepared and that it did not misidentify or incorrectly consolidate its export HMT payments. These declarations do not rule out the possibility of all exporter error. For example, they do not rule out the possibility that certain payments were sent to the wrong lock box. Furthermore, even if the documentation submitted by Ford to the bank were entirely accurate and sent to the correct lock box, bank personnel still may have committed errors in recording those payments in the database. The declarations at best

---

[5]    Ford argues that the FOIA Report is entitled to a presumption of correctness and regularity. This argument was effectively rejected in *Chrylser*. *See* 592 F.3d at 1337.

demonstrate only that some sources of error in the HMT database were not present with respect to Ford.[6] Thus, Customs was entitled to reject Ford's pre-July 1, 1990, claims as insufficient because there still was a high potential for error.

## II

Ford also argues that Customs erred with respect to its post-July 1, 1990, claims. Customs retained all paper documents after July 1, 1990, and it was unable to locate a record of the particular disputed EVMSSs in the Customs depository. Ford submitted evidence that EVMSSs with respect to those transactions appeared in Ford's files, and urges that this evidence was sufficient evidence to establish its right to a refund. Ford is again incorrect.

The relevant regulation, 19 C.F.R. § 24.24(e)(4)(iv)(C), describes the documents an exporter must produce to demonstrate entitlement to a refund for disputed post-July 1, 1990, claims. The regulation states that "[t]he supporting documentation that [Customs] will accept as establishing entitlement to a refund [for post-July 1, 1990, claims] . . . is whichever of the following documents [Customs] *accepted* with the payment at the time it was made," which includes the EVMSS. 19 C.F.R. § 24.24(e)(4)(iv)(C) (emphasis added). Ford argues that

---

[6] The affidavit likewise does not establish entitlement to a refund. Although it was the kind of affidavit contemplated by 19 C.F.R. § 24.24(e)(4)(iv)(C) (". . . affidavits from exporters attesting to the fact that all quarterly harbor maintenance tax payments made by the exporter were made exclusively for exports . . ."), because it did nothing to address the database errors and lack of documentary proof on the part of Ford described above, it did not "clearly prove[] the payments were made for export harbor maintenance fees in the amounts sought to be refunded," *id.*

this regulation requires only that an exporter produce the *type* of documents Customs accepted with payment. Customs argues that the exporter must demonstrate that the particular document it submitted to support the refund claim was actually accepted by Customs.

We think that the best interpretation of the regulation is that actual acceptance by Customs need not be shown. In this respect, the regulation is not ambiguous. Customs explained during rulemaking that it would "accept as proof of payment, when required to be submitted, whichever *type* of document Customs accepted with the payment at the time it was made." 67 Fed. Reg. at 31,950 (emphasis added). As described above, payments were not submitted directly to Customs but were made to bank lock boxes and subsequently transferred to Customs by the bank. There is no contention that an exporter would receive any sort of notification from Customs that its documentation had been "accepted" by Customs. Thus, based on the record before us, it would not be possible for an exporter to demonstrate that its documentation was actually accepted by Customs. The best interpretation of this regulation is that an exporter must produce the type of document it submitted to the bank. Ford admits that the regulation requires at least this much.[7]

However, Ford's evidence that it located these documents in its files does not show submission of the documents to the bank and does not raise a genuine issue of material fact. The presence of these documents in Ford's files shows only that the documents appeared in Ford's files. Ford was in a position to know whether the docu-

---

[7] Oral Argument at 4:16-4:27, *available at* http://www.cafc.uscourts.gov/oral-argument-recordings /2011-1224/all ("Court: So you agree that you at least had to show that you submitted them to the bank? . . . Counsel for Ford: The answer is yes.").

ments in its files were submitted to the bank. Without additional evidence, by declaration or otherwise, that these particular documents were submitted or that their presence in a particular file demonstrated submission, Ford has not raised a genuine issue of material fact. *See Custer v. Murphy Oil USA, Inc.*, 503 F.3d 415, 419-20 (5th Cir. 2007) (explaining that in order to defeat summary judgment, where the issue is whether a particular document was mailed (thus invoking a presumption of receipt), a party must submit physical evidence of mailing or testimony or affidavit concerning customary mailing practices as to the type of document in question). Ford submitted neither type of evidence, and thus did not submit sufficient evidence to defeat summary judgment.

## AFFIRMED

### COSTS

No costs.

# United States Court of Appeals
## for the Federal Circuit

---

**FORD MOTOR COMPANY,**
*Plaintiff-Appellant,*

**v.**

**UNITED STATES,**
*Defendant-Appellee.*

---

2011-1224

---

Appeal from the United States Court of International Trade in case no. 06-CV-0217, Judge Leo M. Gordon.

---

O'MALLEY, *Circuit Judge*, dissenting.

I agree with the majority's interpretation of 19 C.F.R. § 24.24(e)(4)(iv)(C), the governing regulation. I disagree, however, that application of that regulation to the record justifies summary disposition of Ford's refund claims. Because I would remand this action to the Court of International Trade for further fact finding with respect to both the pre- and post-July 1, 1990, claims, I respectfully dissent.

I

As the party defending a favorable summary judgment ruling, the government bears the burden of demonstrating the absence of any genuine issues of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157

(1970). Ford has proffered evidence sufficient to demonstrate that genuine issues of material fact exist with respect to the pre-July 1, 1990, claims. Specifically, in conjunction with the FOIA report, the declarations submitted by Ford suffice to raise a genuine issue of material fact regarding the accuracy of its refund claims.

First is the declaration of Pamela Stec, who worked in Ford's customs operations group, the group charged with ensuring that Ford complied with HMT reporting and payment requirements. Stec personally signed and submitted at least one quarterly HMT report to Customs during the pre-July 1, 1990, period. In that report, which is attached to her declaration, Stec signed a certification indicating that the information in the report related to cargo loaded for export. While Stec was not personally responsible for all of Ford's quarterly HMT filings and payments, she claims to have personal knowledge of, and experience with, Ford's customs compliance practices. Based on that knowledge and experience, and her review of many of Ford's HMT reports, Stec expresses confidence that Ford's HMT quarterly filings filed between 1987 and 1990 would have contained the same information and detail as the one she signed. Stec, in other words, expresses confidence that Ford's HMT quarterly filings are properly classified as export payments.

A declaration submitted by Paulsen Vandevert lends further support for this claim. An international trade attorney at Ford, Vandevert is familiar with Ford's customs practices. Vandevert reviewed several of Ford's quarterly HMT reports and found that each one clearly identified the classification of the HMT payment. Vandevert, moreover, submitted a certification to Customs, in support of Ford's refund claim, in which he claimed that all of Ford's HMT payments identified as Code 502—the code for exports—were properly classified as export pay-

ments.  While Vandevert acknowledges that the Customs database contains errors, he believes that Ford's HMT reports are accurate, and that the accuracy of Ford's reports demonstrates that Ford's payments were properly classified as export payments.  In other words, he asserts that, to the extent the Customs database reflects payments by Ford, the government can have confidence that those entries were not erroneous.

Because we are considering Ford's proffered declarations at the summary judgment stage, we must view them in the light most favorable to Ford.  *Adickes*, 398 U.S. at 157 (noting that a court must view the evidence in the light most favorable to the party opposing summary judgment in determining whether a genuine issue of material fact exists).  Viewed in that posture, Stec's and Vandevert's declarations present credible testimony from two Ford employees who have personal knowledge of Ford's HMT reporting practices and who have reviewed many of Ford's quarterly HMT reports.  Both employees support Ford's claim that its HMT payments were accurately classified as export payments.  A reasonable fact finder could conclude that, given this testimony, it is more likely than not that Ford's HMT payments were properly classified as export payments, both by Ford and Customs, notwithstanding any other errors in the Customs database.

The majority dismisses the significance of the Stec and Vandevert declarations because, in its view, the declarations do not rule out *all* possibility that Ford made errors in its submissions; that certain payments were sent to the wrong lock box; or that bank personnel made errors in recording the payments in the database.  Majority Op. at 10-11.  To survive the government's summary judgment motion, however, Ford is not required to resolve all possible doubts regarding inaccuracies in the Customs

HMT database. Ford need only demonstrate that a reasonable fact finder could conclude that Ford's own documentary proof accurately shows that its payments were remitted for exports. *See* 19 C.F.R. § 24.24(e)(4)(iv)(C) (requiring the submission of "supporting documentation" to "establish[] entitlement to a refund"). A reasonable fact finder could conclude that Ford's proof meets that standard.

## II

Ford's evidence also raises a genuine issue of material fact with respect to the post-July 1, 1990, claims. The principal evidence on which Ford relies to survive summary judgment on those claims is copies of its EVMSSs. The majority believes that the EVMSSs are insufficient to preclude summary judgment because "[t]he presence of these documents in Ford's files shows only that the documents appeared in Ford's files," not that the EVMSSs were submitted to the bank. Majority Op. at 12. That inference is not the most favorable one to Ford, however. The most favorable inference is that Ford submitted the EVMSSs with its HMT payments to the bank. Many of the EVMSSs are dated and signed under "penalties provided by law," and they identify Customs and a post office box address in the "send to" field. A reasonable fact finder could conclude that Ford would not have gone to the trouble of preparing the EVMSSs, having a representative sign them under penalty, and inserting what appears to be Customs's bank's address unless Ford actually remitted the documented payments to the bank. A reasonable fact finder, therefore, could conclude that the EVMSSs support Ford's claimed entitlement to a refund on its post-July 1, 1990, claims.

## III

I do not suggest that Ford's evidence conclusively establishes its right to a refund. The trial court would be entitled to find at trial that Ford's evidence does not support its claim because, for example, Ford's witnesses are not credible on the stand, or other evidence proves Ford's quarterly HMT reports and EVMSSs unreliable. Ford, however, is not required to conclusively establish its case at the summary judgment stage. "[T]he issue of material fact required by [Federal Rule of Civil Procedure] 56(c) to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Service Co.*, 391 U.S. 253, 288-89 (1968)).

Ford has proffered sufficient evidence to withstand summary judgment. It is entitled to have its witnesses heard and its evidence considered at trial before a decision regarding its right to a refund is reached. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence but to determine whether there is a genuine issue for trial." *Id.* By affirming the trial court's grant of summary judgment, the majority prematurely decides this case on its merits.